**UNITED STATES of America, Appellee,**

v.

**Melvin PINCKNEY, Defendant,**

and

**Fundador Cuevas, also known as Powerhouse, Defendant–Appellant.**

No. 1511, Dockets 95–1181(L), 95–1317.

United States Court of Appeals, Second Circuit.

Argued March 22, 1996.

Decided March 22, 1996.

Filed May 23, 1996.

---

Marjorie M. Smith, Englander & Smith, Tappan, NY, for Defendant–Appellant Fundador Cuevas.

Frank McClain–Sewer, Assistant United States Attorney, Brooklyn, New York (Zachary Carter, United States Attorney, Eastern District of New York, Peter A. Norling, Assistant United States Attorney, Brooklyn, New York, of counsel), for Appellee.

Before MAHONEY, McLAUGHLIN, and CALABRESI, Circuit Judges.

McLAUGHLIN, Circuit Judge:

After a jury trial in the United States District Court for the Eastern District of New York (Charles P. Sifton, *Chief Judge* ), Fundador Cuevas was convicted of: (1) operating a chop shop, in violation of 18 U.S.C. § 2322; and (2) conspiring to operate a chop shop, in violation of 18 U.S.C. § 371.

Cuevas appealed, arguing that there was insufficient evidence to support his convictions. Specifically, he argued that the government: (1) failed to prove a sufficient nexus to interstate commerce to support his conviction under either the substantive crime, 18 U.S.C. § 2322, or the conspiracy, 18 U.S.C. § 371; and (2) also failed to prove that any conspirator believed that vehicle parts would enter interstate commerce to support a conviction under 18 U.S.C. § 371. We agreed and reversed Cuevas's convictions by summary order dated March 22, 1996, and indicated that this opinion, explaining the rationale for our decision, would follow.

## BACKGROUND

The government charged Fundador Cuevas and others with conspiracy to operate a chop shop, and operation of a chop shop. During the six-day trial, the government produced evidence that, during the first six months of 1994, Cuevas and others participated in a less-than-legitimate enterprise in an abandoned lot in Brooklyn, New York. The defendants surrounded the lot with fencing and other blockades, preventing access from the street and obstructing pedestrians' view of the defendants' bustling business.

The government proved that Cuevas's co-workers would bring stolen cars to the Brooklyn lot, where Cuevas and his helpers would remove vehicle identification numbers from the cars and dismantle the cars in a process commonly known as "stripping." Strippers disassemble the car to get its parts for resale to garages and auto body shops. Cuevas taught others the art of stripping, and helped to coordinate the enterprise.

The government presented evidence that the car parts were sold to local garages and auto body shops, placing significant emphasis on the testimony of one of the workers, Howard Rubenfeld. Rubenfeld testified that, before he worked at the Brooklyn lot, he worked for ARN Scrap Processing. ARN had a contract with the New York City Department of Sanitation to remove the abandoned car carcasses that litter the city streets and to transport them to scrap dealers in the tri-state area. Rubenfeld testified that, when he worked for ARN, he would transport the carcasses to various scrap dealers in New York, New Jersey, and Connecticut, bringing his business to the dealer who paid the most for the scrap.

Addressing his employment at the Brooklyn lot, Rubenfeld testified that, after workers stripped the stolen cars, he would load the stripped hulks onto his truck and haul them to scrap dealers. When asked by the prosecutor where he took these stripped vehicles, Rubenfeld replied, "I took it to the scrap processing company that I always do business with." Significantly, the prosecutor did *not* ask Rubenfeld where this scrap processing company was located.

Other testimony established that the Brooklyn workers knew that stripped car parts were brought to auto body shops in Brooklyn, New York. Still others testified

that, while they saw vans leave the Brooklyn lot laden with car parts, they did not know the destination of those vans. The government produced no testimony from anyone who knew of or participated in the delivery of car parts to points outside New York. Finally, there was evidence that all the cars stripped in the Brooklyn lot bore New York license plates.

At the close of the government's case, Cuevas moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The court reserved decision on the Rule 29 motion and the defendant rested.

In the court's charge on the substantive count, it explained that the government had to prove that the distribution or sale of the cars or their parts occurred in interstate commerce. Similarly on the conspiracy count, the court charged that there had to be an agreement to join an enterprise in violation of the chop shop statute, and that the enterprise "must be of a sort to have as its impact an impact on interstate commerce."

The jury returned verdicts of guilty on both counts. Cuevas now appeals.

## DISCUSSION

To "reduce auto theft significantly by taking the profit away from car thieves," Congress passed the Anti Car Theft Act ("the Act"), Pub.L. No. 102–519, 106 Stat. 3384 (1992). H.R.Rep. No. 102–851(I), 102d Cong., 2d Sess. 13, *reprinted in* 1992 U.S.C.C.A.N. pp. 2829, 2830, 2903. In the Act Congress criminalized (a) "car-jacking" and, (b) to remove the profit motive for carjackers and car thieves, the knowing operation of a "chop shop." *See* 18 U.S.C. § 2119 ("car-jacking" statute); 18 U.S.C. § 2322 ("chop shop" statute).

The "chop shop" statute provides, in pertinent part:

(a) In general.—

(1) Unlawful action.—Any person who knowingly owns, operates, maintains, or controls a chop shop or conducts operations in a chop shop shall be punished by a fine under this title or by imprisonment for not more than 15 years, or both. . . .

(b) Definition.—For purposes of this section, the term "chop shop" means any building, lot, facility, or other structure or premise where one or more persons engage in receiving, concealing, destroying, disassembling, dismantling, reassembling, or storing any passenger motor vehicle or passenger motor vehicle part which has been unlawfully obtained in order to alter, counterfeit, deface, destroy, disguise, falsify, forge, obliterate, or remove the identity, including the vehicle identification number or derivative thereof, of such vehicle or vehicle part and to distribute, sell, or dispose of such vehicle or vehicle part *in interstate or foreign commerce.*

18 U.S.C. § 2322 (emphasis added).

There are several essential elements to this crime and the government must prove each of them beyond a reasonable doubt. One of those elements is that the defendant dispose of vehicles or vehicle parts in interstate commerce. Both sides devote much effort to resolving an apparent ambiguity regarding the interstate commerce element of the crime: whether the element is "jurisdictional" only, or whether it is an element of the crime with a corresponding *mens rea.*

The government concedes that the interstate commerce element is a *sine qua non* of federal jurisdiction, but contends that it was included by Congress only to insulate the federal chop shop statute from constitutional challenge under the Commerce Clause. *See United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Cuevas argues that the interstate element goes beyond jurisdiction, and is a *mens rea* element of the crime. Thus, the defendant contends that the government must prove beyond reasonable doubt that the defendant stole and dismantled the cars "in order to" distribute car parts in interstate commerce. In short, Cuevas believes that the government must prove that the defendant knew that the criminal enterprise had some connection with interstate commerce.

## I. *The Substantive Count*

There is some ambiguity in the statute. We need not resolve this ambiguity,

however, because we hold that under either party's theory the government failed to prove that the defendant disposed of vehicle parts in interstate commerce.

The government contends that it established a sufficient nexus to interstate commerce in two ways. Both arguments lack merit.

First, the government contends, without citation to any authority, that proof of the introduction of the car parts into the "normal flow of commerce" in Brooklyn is enough to prove the interstate commerce element of the chop shop statute because a juror could reasonably infer that it was *inevitable* that vehicle parts entered interstate commerce. The government contends that this unique theory of inevitability is enough to prove beyond a reasonable doubt that Cuevas distributed vehicle parts in interstate commerce. We disagree.

While it is true that a conviction may be based solely on reasonable inferences from circumstantial evidence, *United States v. Fermin*, 32 F.3d 674, 678 (2d Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995), a conviction cannot rest on mere speculation or conjecture. *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994). The government failed to produce any evidence, circumstantial or otherwise, of a connection between Cuevas's activity and interstate commerce. The government proved only that workers in the Brooklyn lot distributed car parts to establishments in New York. This direct evidence of purely *intra* state activities is not evidence of distribution in *inter* state commerce.

Furthermore, it is unreasonable to ask a jury to infer from this localized conduct that there was inevitable interstate activity. The government's argument that goods sold or distributed in Brooklyn auto body shops will inevitably enter interstate commerce is an argument based solely on a leap of faith, not logic, and has no evidentiary basis. *Cf. United States v. Javino*, 960 F.2d 1137, 1143–44 (2d Cir.) (proof that bottle was manufactured in United States not proof that bottled incendiary device was made in United States), *cert. denied*, 506 U.S. 979, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992).

Second, the government claims it proved the interstate commerce element beyond a reasonable doubt through Rubenfeld's testimony. Rubenfeld testified that, while working for ARN Scrap Processing, he would bring scrap metal to the dealers paying the highest prices in New York, New Jersey, or Connecticut. Rubenfeld stated that, while working at the Brooklyn lot, he brought scrap metal to the scrap dealer he "always do[es] business with," but did not identify the location of this company. That question could have—and should have—been put squarely to Rubenfeld.

The government argues that because Rubenfeld testified that he previously dealt with a number of scrap dealers both inside and outside New York, and because he testified that he hauled scrap from the Brooklyn lot to the dealer he "always do[es] business with," a rational juror could infer that Rubenfeld transported scrap across state lines. However, the government presented no evidence that would have permitted the inference that the single scrap dealer to whom Rubenfeld referred was one of the dealers located outside, rather than inside, New York. Thus, while we view the evidence in a light most favorable to the government, and resolve all inferences that a jury might have drawn in the government's favor, *United States v. Aulicino*, 44 F.3d 1102, 1114 (2d Cir.1995), we hold that, on this record, it would be unreasonable for a juror to conclude that the interstate nexus was proven beyond a reasonable doubt.

## II. *The Conspiracy Count*

Cuevas also challenges his conviction on the conspiracy count to violate the chop shop statute. Cuevas argues that because the interstate element has a corresponding *mens rea* requirement, proof of conspiracy depends on proof that the defendants intended or reached an agreement to distribute vehicle parts outside New York. The government responds that, while the interstate commerce element of the chop shop statute is indeed jurisdictional and must be proven beyond a reasonable doubt, that element is established as to the conspiracy count if there is proof (1)

that the vehicle parts were distributed in interstate commerce, regardless of whether the conspirators knew this; or (2) even if no interstate distribution occurred, that one of the conspirators believed it occurred.

The government contends, therefore, that it satisfied its burden of proof on the conspiracy count: (1) by presenting evidence that vehicle parts were distributed in Brooklyn and that a reasonable juror could infer that the parts would inevitably find their way into interstate commerce; and (2) by Rubenfeld's testimony that he brought the stripped hulks of cars to the scrap dealer with whom he always does business. We disagree. Regardless of whether the interstate commerce element of the chop shop statute is jurisdictional only or a *mens rea* element, the government has failed to prove all of the elements of conspiracy beyond a reasonable doubt.

■ It is elementary that conspiracy is a crime, separate and distinct from the substantive offense. *See United States v. Feola*, 420 U.S. 671, 694, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975). Conspiracy requires proof of: (1) an agreement among the conspirators to commit an offense; (2) specific intent to achieve the objective of the conspiracy; and (3) usually, an overt act to effect the object of the conspiracy. *See United States v. Montour*, 944 F.2d 1019, 1024 (2d Cir.1991). Although the government need not prove commission of the substantive offense or even that the conspirators knew all the details of the conspiracy, *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994), it must prove that "the intended future conduct they … agreed upon include[s] all the elements of the substantive crime." *United States v. Rose*, 590 F.2d 232, 235 (7th Cir.1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979).

One of the elements of the substantive crime of operating a chop shop is that the vehicle parts enter interstate commerce. 18 U.S.C. § 2322(b). And this must be proven beyond a reasonable doubt. Under *United States v. Rosa*, if the interstate commerce element is merely jurisdictional, and the gov-

ernment *proves* that the goods entered interstate commerce, the conviction for conspiracy will stand whether or not defendants knew of the interstate nature of their actions because "knowledge that the goods have traveled interstate … is irrelevant to the essential nature of [the] agreement." *Rosa*, 17 F.3d at 1546. If the interstate commerce element is merely jurisdictional, and the government *fails* to prove the goods entered interstate commerce, the conspiracy is also proven if one conspirator believed the goods were to enter interstate commerce. *See id.* If, on the other hand, the interstate commerce nexus is a *mens rea* element of the crime, proof of conspiracy depends on proof that the conspirators believed vehicle parts were to enter interstate commerce. *See id.*

■ It follows, therefore, that regardless of whether the interstate commerce element of the chop shop statute is characterized as a *mens rea* element or as merely jurisdictional in nature, the government has failed to satisfy its burden of proof with regard to the conspiracy charge. The government has proven neither a connection between the Brooklyn lot and interstate commerce nor that Cuevas or any conspirator believed that vehicle parts were to enter interstate commerce.

As discussed in Part I, the government's evidence with regard to the substantive offense was insufficient to establish the nexus between Cuevas's actions and interstate commerce. The government relies on these same arguments to prove the interstate nexus with regard to the conspiracy count. The government, moreover, does not argue on appeal that it proved any conspirators believed that the goods were to enter interstate commerce; and a review of the record discloses no such proof.

### CONCLUSION

For the foregoing reasons we reverse the convictions of Fundador Cuevas, because the government failed to adduce proof to sustain a conviction for violation of the chop shop statute or conspiracy to violate the chop shop

statute, and remand to the district court with instructions to dismiss the indictment.