07-1435-cr(L)
USA v. Lorenzo

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

----

August Term, 2007

(Argued: June 16, 2008          Decided: July 18, 2008)

Docket Nos. 07-1435-cr(L), 07-1855-cr(CON)


--------------------------------------------------

UNITED STATES OF AMERICA,

                    Appellee,

                    -v.-

ANDREA LORENZO and JULIO LORENZO,

                    Defendants-Appellants,

FRANCISCA LEERDAM,

                    Defendant.

--------------------------------------------------

Before:   JACOBS, Chief Judge, STRAUB, Circuit Judge, and JONES, District Judge.[*]

     On appeal from judgments of conviction entered in the Eastern District of New York (Walter, J.) following a jury trial, in which both defendants-appellants were convicted of conspiracy to import cocaine in violation of 21 U.S.C. §§ 960 and 963; and

---

[*]The Honorable Barbara S. Jones of the United States District Court for the Southern District of New York, sitting by designation.

conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841 and 846. Defendant-appellant Andrea Lorenzo was also convicted of importation of cocaine in violation of 21 U.S.C. §§ 952 and 960.

Reversed and remanded for entry of judgments of acquittal.

RAMON A. PAGAN, Bronx, New York, for Defendant-Appellant Andrea Lorenzo.

JANEANNE MURRAY, New York, New York (Robert A. Culp, Garrison, New York, on the brief), for Defendant-Appellant Julio Lorenzo.

BRIAN MEAGHER, Assistant United States Attorney, Brooklyn, New York (Benton J. Campbell, United States Attorney for the Eastern District of New York, Susan Corkery, Elizabeth A. Geddes, Assistant United States Attorneys, Brooklyn, New York, on the brief), for Appellee.

JONES, District Judge:

Defendants-appellants Andrea and Julio Lorenzo, following a four-day jury trial of a four-count superseding indictment before Donald E. Walter, Visiting Judge,[1] in the United States District Court for the Eastern District of New York, were convicted of conspiracy to import cocaine in violation of 21 U.S.C. §§ 960 and 963 (Count 1); and conspiracy to distribute and possess with intent

---

[1] The Honorable Donald E. Walter of the United States District Court for the Western District of Louisiana.

to distribute cocaine in violation of 21 U.S.C. §§ 841 and 846 (Count 3). As to Count 2, importation of cocaine in violation of 21 U.S.C. §§ 952 and 960, Andrea Lorenzo was convicted, while Julio Lorenzo was acquitted. Both Lorenzos were acquitted of Count 4, attempted possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841 and 846. Andrea Lorenzo was sentenced to a term of 60 months' imprisonment, to be followed by a four-year term of supervised release, and a $300 special assessment. The district court sentenced Julio Lorenzo to 60 months' imprisonment, to be followed by a four-year term of supervised release, and a $200 special assessment. On appeal, the Lorenzos contend that the evidence adduced at trial was insufficient to sustain the judgments of conviction against them. Julio Lorenzo also argues alternatively that he should be granted a new trial in the interest of justice, and raises challenges to his sentence. We agree that the evidence was insufficient to support the judgments of conviction, and for the reasons that follow, reverse the judgments of conviction against Andrea and Julio Lorenzo and remand to the district court for entry of judgments of acquittal.[2]

---

[2] Following oral argument and upon due consideration of the record on appeal, we issued an Order filed June 17, 2008, reversing Andrea Lorenzo's judgment of conviction, issuing the mandate forthwith, and noting that an opinion would issue in due course.

BACKGROUND

The present prosecutions arose out of a controlled delivery of narcotics initiated after officers with Customs and Border Protection ("CBP") discovered over three kilograms of cocaine hidden in defendant Francisca Leerdam's suitcases during a routine customs examination at John F. Kennedy International Airport ("JFK Airport") on October 13, 2005. The evidence at trial consisted largely of, inter alia, Leerdam's testimony as to the events surrounding the October 13, 2005 trip and a previous trip she made to the United States a month earlier, and the testimony of various agents involved in the customs search and controlled delivery; the Lorenzos offered no evidence. The evidence is summarized below in the light most favorable to the prosecution.

A.    Leerdam's Entry into the Conspiracy

In July, 2005, Leerdam met a man known as Amauri (Andrea Lorenzo's nephew) in a nightclub in Santo Domingo in the Dominican Republic, who offered her a job smuggling drugs outside of the Dominican Republic. (Trial Transcript ("Tr.") at 141-42.) The day after their meeting at the nightclub, he asked Leerdam to meet him at a house, where she found him cutting up carrots that she learned were for her to swallow "to train [her], to see if [she] could swallow drugs." (Id. at 143.) Leerdam was unable to swallow the carrots easily, and thus planned to smuggle drugs outside of the Dominican Republic in suitcases instead. (Id. at 144.)

Leerdam's first smuggling trips--three in all--were from the Dominican Republic to the Netherlands; for each trip, she received approximately $3,000 from Amauri, (id. at 183). Amauri then asked her to smuggle drugs into the United States. Leerdam initially refused because of her view that there were "too many police officers . . . in the U.S.," (id. at 145), but eventually acceded to Amauri's request.

B. The September Trip

Prior to Leerdam's first trip to the U.S., Amauri told her to pack her clothing into a suitcase and take a taxi to a store. (Id. at 146.) Upon arrival, Leerdam met Amauri's girlfriend, Camelina, with whom she went to a nearby hotel, where Amauri arrived and instructed Leerdam to transfer her clothing from her suitcase to one that he provided for her. (Id. at 147.) At the hotel, he gave Leerdam an airplane ticket, her passport, $100 in cash, and a piece of paper with an address on it, and instructed her to buy a phone card upon her arrival in the U.S. in order to call him for further instructions. (Id. at 147-48.)

On September 1, 2005, Leerdam departed from the Santo Domingo Airport for JFK Airport. She passed through customs at JFK Airport without incident, purchased a phone card, and called Amauri for further instructions; he told her to take a taxi to Corona, Queens. At the location in Corona to which her taxi was directed, two men were waiting, and one greeted her and eventually introduced

-5-

himself as Ronnie. (Id. at 152-53.) Ronnie paid the taxi driver and removed the suitcase from the cab. Leerdam entered a different vehicle with Ronnie and the other individual, and they drove to Ronnie's apartment in Pennsylvania. At Ronnie's apartment, Ronnie took Leerdam's suitcase into a bedroom, from which he emerged with a different suitcase. (Id. at 154.)

Eventually, Ronnie and the other individual drove Leerdam back to Corona, Queens. In Corona, a white S.U.V. pulled up, and Ronnie exited the car to speak with the driver of the S.U.V., Julio Lorenzo. (Id. at 155.) Ronnie and Julio spoke for approximately 5 minutes; Leerdam was unable to hear the contents of their conversation. (Id.) Ronnie then told Leerdam to go to the S.U.V., which Julio had exited in order to get the suitcase. (Id.) Upon entering the S.U.V., Leerdam met Andrea Lorenzo for the first time; Andrea asked Leerdam "how did it go for [you]," (id. at 157), and noted that Amauri had called and asked the Lorenzos to take Leerdam to a nearby hotel, (id. at 157-58). At the hotel, Andrea stayed in the S.U.V., while Julio accompanied Leerdam to the reception desk and paid for one night's stay. Julio then escorted Leerdam up to the room, and told Leerdam to call him if she needed anything. (Id. at 158-59.)

The next day, September 4, 2005, Julio returned to the hotel with a brown bag containing $14,000 that he told Leerdam was for Amauri, and wrapped the cash inside clothing in her suitcase.

(Id. at 161.) Julio took Leerdam to JFK Airport and accompanied her to the terminal from which her return flight was departing and stayed with her until she checked her luggage. (Id. at 161-63.) When Leerdam arrived in Santo Domingo, she retrieved her suitcase and received a phone call from Camelina, who picked Leerdam up and took her to a nearby hotel. (Id. at 164.) At the hotel, Camelina counted the money in Leerdam's suitcase; Amauri called Camelina "to see if everything was complete," (id. at 165), which Camelina confirmed. Camelina then gave Leerdam $3,000. (Id.) At trial, Leerdam admitted that she had never seen the contents of the suitcase during this trip, (id. at 191), though she simply assumed that there were drugs therein because Amauri told her so, (id. at 187-88).

C.    The October Trip

Shortly after the September Trip, Amauri asked Leerdam to take another trip to the U.S., and Leerdam agreed. (Id. at 165-66.) On October 13, 2005, Leerdam boarded a flight from Santo Domingo to JFK Airport, this time with two suitcases provided by Amauri. (Id. at 166.) Upon arrival at JFK Airport, Leerdam underwent a routine customs examination, during which agents from CBP discovered what was later determined to be 3.25 kilograms of cocaine. (Id. at 44-45, 269.) A special agent with Immigration and Customs Enforcement ("ICE") testified at trial that the wholesale value of this cocaine was approximately $67,000, and that

the street value was approximately $260,000. (Id. at 271-72.) At trial, Leerdam testified that until confronted by CBP agents, she did not know the type or amount of drugs in her suitcases. (Id. at 182.) Leerdam was arrested by CBP officers at approximately 11 p.m. on October 13, (id. at 295-96), and she agreed to cooperate with law enforcement by permitting certain phone calls to be monitored and recorded, and participating in a controlled delivery of the cocaine, (id. at 60-61, 169-70).

The first call Leerdam made was to Amauri in the Dominican Republic; he directed her to find a taxi driver, preferably one who had a cellular phone, and to take the taxi to 103rd Street and Corona Avenue in Queens. (Government Exhibit ("GX") 10-A (Translated English Transcription of Telephone Conversation between Leerdam and Amauri on October 13, 2005).) An agent from ICE, Jason Hurwitz, posed as a taxi driver and took Leerdam in an undercover taxi to 103rd Street and Corona Avenue in Queens. At approximately 12:45 a.m. on October 14, Leerdam placed another call to Amauri in the Dominican Republic. (Tr. 62.) During that call, Amauri asked to speak with the taxi driver and told Hurwitz to take Leerdam to a nearby hotel. (Id.; GX 3500FL4 at 3-4 (Translated English Transcriptions of Recorded Telephone and Monitoring Device Conversations).) After briefly conversing with Hurwitz, Amauri asked him to put Leerdam back on the line, and altered course, giving Leerdam a local Queens number to call, with

instructions to ask for Julio. (Tr. 63; GX 3500FL4 at 4-7.)

Leerdam called the Queens number shortly thereafter, which was answered by Andrea. (Tr. 63.) Leerdam asked for Julio, and when told that he was sleeping, responded that Amauri told her to ask for him. (GX 3500FL4 at 11.) Andrea responded that Amauri had just called, and that she should come to the Lorenzo residence to wait for a taxi to "take [her] to, to where . . . uh, Julito took [her]," (id. at 13), and that Amauri would be calling Andrea back. Leerdam arrived at the Lorenzo residence at approximately 1 a.m. and found Andrea in her nightgown waiting on the porch. (Tr. 63-64.) Hurwitz pulled the taxi in front of the house and helped Leerdam remove the suitcases from the trunk of the taxi; Andrea took one suitcase and Leerdam took the other as they proceeded towards the house. (Id. at 66.) Upon reaching the porch, Andrea placed the suitcase she was carrying inside the house. (Id. at 180.) During the course of Leerdam's egress from the taxi and their approach towards the house, the following exchange occurred:

LEERDAM: Is that you, ma'[a]m?

ANDREA: How are you, [unintelligible ("[U/I]")]? Damn it, so much work, huh?

LEERDAM: Yes.

ANDREA: [U/I].

[Pause]

ANDREA: Oh, my God, honey! Yes, he called me, me and told me to call a taxi from the corner that I know to take you to the, the hotel.

LEERDAM:  Right.

ANDREA:  So you can spend the night right there. Because [U/I] I'm sleeping in a room a lot smaller tha[n] this one.  Otherwise, we could both be together. [U/I] a small bed.

LEERDAM:  And the suit-?

(GX 3500FL4 at 24.)  As Leerdam was asking Andrea about the suitcases, she was interrupted by agents who told Leerdam and Andrea not to move and proceeded to arrest them.  (Id.)

Agents entered the Lorenzo home and came upon Julio Lorenzo Jr., and arrested him.  (Tr. 71.)  Leerdam later told agents that Julio Jr. was not the person whom she had dealt with previously, and agents then returned to the home where they returned Julio Jr. and arrested the senior Julio Lorenzo.  (Id.) Inside the home, agents recovered an address book which listed several of Amauri's phone numbers repeatedly.  (Id. at 67-68.)

Upon her arrest, Andrea was advised of and waived her Miranda rights, and indicated her willingness to speak to law enforcement.  (Id. at 210-11.)  During an interview conducted shortly thereafter, Andrea disclaimed knowing Leerdam and said that she had never seen her before.  (Id. at 211-12.)  She stated that she was doing a favor for her nephew by helping to get Leerdam situated in a hotel, and that she had no intention of bringing Leerdam into her house.  (Id. at 212.)  Andrea also noted that she did not know what was in the suitcases and that it was a mistake to do this favor for her nephew.  (Id.)  At a subsequent interview in

-10-

the early morning at the ICE office at JFK Airport, Andrea was again advised of and waived her <u>Miranda</u> rights, and noted that she had in fact met Leerdam approximately two months prior, but that she didn't know her name. (<u>Id.</u> at 282.) Julio was also advised of and waived his <u>Miranda</u> rights during an interview at the ICE office, and he stated that he had done a favor for his nephew by picking Leerdam up, taking her to a hotel, and dropping her off at JFK Airport. (<u>Id.</u> at 284-85.) He denied giving Leerdam any money. (<u>Id.</u> at 285, 313.)

The trial commenced on December 4, 2006, and the jury returned its verdict on December 7, 2006. Andrea Lorenzo's judgment of conviction was entered on April 4, 2007; Julio Lorenzo's was entered on May 1, 2007. Both defendants-appellants filed timely notices of appeal, and these appeals followed.

DISCUSSION

On appeal, the Lorenzos contend that there was insufficient evidence adduced at trial to demonstrate that they knowingly entered into the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy. Andrea Lorenzo also argues that the evidence was insufficient to prove that she knowingly and intentionally imported cocaine. We agree.

"A defendant bears a heavy burden in seeking to overturn

a conviction on grounds that the evidence was insufficient." United States v. Cruz, 363 F.3d 187, 197 (2d Cir. 2004). "The 'relevant question' in this inquiry is 'whether, after viewing the evidence in the light most favorable to the [government], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in Jackson). Direct evidence is not required; "[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt." Id. "Our evaluation looks at 'the evidence in its totality,' and the Government 'need not negate every theory of innocence.'" United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)). "While we defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence, specious inferences are not indulged," United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004) (internal quotation marks and citation omitted), because "'[it] would not satisfy the [Constitution] to have a jury determine that the defendant is probably guilty.'" Rodriguez, 392 F.3d at 544 (quoting Sullivan v. Louisiana, 508 U.S. 275, 278 (1993)) (emphasis in Sullivan;

-12-

alterations in Rodriguez). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." Glenn, 312 F.3d at 70 (internal quotation marks omitted).

"To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." Rodriguez, 392 F.3d at 545 (internal quotations omitted). "[W]here the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute[s]." United States v. Gaviria, 740 F.2d 174, 183 (2d Cir. 1984) (internal quotation marks omitted). "To convict a defendant as a member of a conspiracy, the government must prove that the defendant agree[d] on the essential nature of the plan," United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998) (internal quotation marks omitted), and that there was a "conspiracy to commit a particular offense and not merely a vague agreement to do something wrong," United States v. Provenzano, 615 F.2d 37, 44 (2d Cir. 1980) (internal quotation marks omitted).

"[O]nce a conspiracy is shown to exist, the evidence

-13-

sufficient to link another defendant to it need not be overwhelming." United States v. Nusraty, 867 F.2d 759, 762 (2d Cir. 1989) (internal quotation marks omitted). But "[s]uspicious circumstances . . . are not enough to sustain a conviction for conspiracy," id. at 763, and "mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement," id. at 764; likewise, "a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy," United States v. Samaria, 239 F.3d 228, 235 (2d Cir. 2001).

A.    Julio Lorenzo

The government contends that there was "ample evidence adduced at trial" to demonstrate that Julio knew that the object of the conspiracy was cocaine smuggling and distribution, and points principally to the following evidence as indicia of his knowledge: (1) Julio's encounter and conversation with Ronnie in September 2005 followed by his stewardship of Leerdam until her flight back to the Dominican Republic; (2) Julio's transfer of the $14,000 in cash to Leerdam to deliver to Amauri; (3) Amauri's instruction to Leerdam during the October 2005 trip that she call the Lorenzo residence and ask for Julio; and (4) Julio's false exculpatory statement upon questioning that he had never given Leerdam any money.

It is clear, viewing the evidence in the light most favorable to the government, that a reasonable jury could find that a drug-smuggling conspiracy existed and that Leerdam and Amauri knowingly participated in it. The government's argument focuses on various events that purportedly link Julio to this conspiracy. However, the evidence highlighted by the government, when considered in the aggregate, still lacks a critical element--any indication from which a jury could reasonably infer that Julio knew of the nature and specific object of the conspiracy.

First, although there is ample evidence demonstrating the existence of the conspiracy, and that Julio was present at and participated in events that furthered the conspiracy, there is insufficient evidence to show that he did so knowingly and with the specific intent to further a cocaine smuggling and distribution conspiracy. With respect to the September trip, there is no evidence in the record as to the contents of either the conversation between Julio and Ronnie or the suitcase that Leerdam was carrying. The government contends that the $14,000 that Julio gave to Leerdam for delivery to the Dominican Republic was "proceeds of the conspiracy," supporting an inference that Julio knew of the aims of the conspiracy. However, in light of the absence of any evidence indicating Julio's knowledge of the contents of Leerdam's suitcase, or prior participation in this conspiracy, and his complete lack of participation in the events

surrounding the October trip (where it is clear that cocaine was actually smuggled into the country), we cannot say that there are "facts sufficient to draw a 'logical and convincing connection' between circumstantial evidence of an agreement, and the inference that an agreement was in fact made," Jones, 393 F.3d at 111.

No doubt the transfer of $14,000 from Julio to Leerdam is suspicious and, viewed in the light most favorable to the government, indicative of participation in illegal behavior. But such a transfer is consistent with participation in a wide variety of offenses, and in light of the other evidence, is insufficient to prove Julio's intent to participate in the conspiracy charged in the indictment. See Samaria, 239 F.3d at 237 (holding that there was insufficient evidence of defendant's intent to engage in a conspiracy to receive or possess stolen goods despite his presence in a car with boxes containing the goods because "the exterior appearance of the boxes was equally consistent with any number of different criminal offenses including the receipt and possession of drugs, illegal weapons, counterfeit currency, or the receipt of legal goods such as drug paraphernalia that would later be employed in a criminal endeavor").

The government also asks us to view Amauri's instruction that Leerdam call Julio during the October trip as supporting an inference that "Amauri would not have entrusted Julio with the suitcases concealing the narcotics, worth over $250,000, unless

-16-

Julio had known what was concealed within them and that it was reasonably foreseeable to him that the smuggled narcotic from the Dominican Republic was cocaine." This unfulfilled request for Julio cannot support such a speculative and attenuated inference; Julio's continued dormancy despite Leerdam's request severely undermines the notion that it was critical that Julio specifically be entrusted with such valuable narcotics.

Finally, the government relies on the false exculpatory statement made by Julio after his arrest. We have observed that

> [w]hile false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt and have independent probative force, . . . falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.

United States v. Johnson, 513 F.2d 819, 824 (2d Cir. 1975). We find that Julio's statement, while indicative of consciousness of guilt, is insufficient in light of the rest of the evidence against him.

It bears emphasis that we recognize that "a defendant's knowing agreement to join a conspiracy must, more often than not, be proven through circumstantial evidence," Nusraty, 867 F.2d at 764. We have seen cases where the circumstantial evidence considered in the aggregate demonstrates a pattern of behavior from

-17-

which a rational jury could infer knowing participation. See, e.g., United States v. Martino, 759 F.2d 998, 1003-04 (2d Cir. 1985) (holding that defendant's arrival at a time and place where a heroin transaction was scheduled to occur, where he witnessed an exchange of money for packages of a substance made to resemble heroin, coupled with statements indirectly indicating that he was the intended eventual purchaser of a portion of the heroin, coincidental coming and going with participants in the conspiracy, and a false exculpatory statement upon his arrest at the scene, was sufficient circumstantial evidence to show knowing participation in a conspiracy to distribute and possess with intent to distribute heroin). This is not such a case.

B. Andrea Lorenzo

1. The Conspiracy Counts

The evidence as to Andrea's knowing participation in the conspiracy is even more sparse and requires little discussion. The government contends that it was permissible for the jury to infer that Andrea knowingly participated in the conspiracy with the specific intent to import and distribute cocaine from: (1) the record of conversations between Amauri and Andrea on the evening of October 13, 2005; (2) Andrea's instruction to Leerdam that evening that she come to the Lorenzo residence to take a different taxi to a hotel; (3) her greeting of Leerdam as she arrived; (4) her transfer of one of Leerdam's suitcases from the taxi into her

-18-

house; (5) Andrea's presence in the S.U.V. during Leerdam's September visit; and (6) Andrea's false exculpatory statement following her arrest that she had never seen Leerdam before and did not know her. This evidence, considered in the aggregate and viewed in the light most favorable to the government, supports at most an inference that Andrea knew that she was assisting suspicious behavior; viewed in this light, it is also, as Andrea contends, consistent with providing hospitality to her nephew's girlfriend and regretting providing such assistance. See Glenn, 312 F.3d at 70 ("[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." (internal quotation marks omitted)).

2. The Substantive Importation Count

Because the government proceeded on an aiding and abetting theory with respect to the substantive importation count, the government was required "to prove, beyond a reasonable doubt, that the defendant knew the specific nature of the . . . underlying crime," United States v. Friedman, 300 F.3d 111, 124 (2d Cir. 2002). For the reasons discussed with respect to the conspiracy counts against Andrea, the evidence was also insufficient to support a conviction on this count.

C.   Julio Lorenzo's Other Contentions

Because we reverse Julio's judgment of conviction in its entirety on sufficiency grounds, we need not address his other arguments.


                          CONCLUSION

For the foregoing reasons, defendants-appellants' judgments of conviction are reversed in their entirety, and remanded to the district court for entry of judgments of acquittal on each count.  The mandate as to Julio Lorenzo (docket number 07-1855) shall issue forthwith.