07-3353-cr
United States v. Kapelioujnyj (Potocki)

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: July 17, 2008                           Decided: October 22, 2008)

Docket No. 07-3353-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

— v .—

OSTAP KAPELIOUJNYJ, KRZYSZTOF SPRYSAK, LAJOS ABE BERGER, MERAB MERABISHVILI, TOMEK WOJTASCZYK, RAFAL ZAJAC, LUKASZ ZALEWSKI, KRZYSZTOF CZYZ, PAWEL DROZDAL, PAWEL GUZAL, SHALVA KARTVELISHVILI, KRZYSZTOF KIELAN, SEBASTIAN KULON, KAROL LISZEWSKI, ANDRZEJ MADEJ, MACIEJ WYSZYNSKI, TOMASZ LNU, KRZYSZTOF CZEKAJ, RAFAL LNU,

*Defendants,*

ADAM POTOCKI,

*Defendant-Appellant.*

_____

Before:        NEWMAN, CALABRESI, AND B.D. PARKER, *Circuit Judges*.

_____

Appeal from a judgment of conviction in the United States District Court for the Eastern District of New York (Seybert, *J.*) for conspiracy to sell stolen property in violation of 18 U.S.C. § 371.  Because the government failed to prove both that the defendant believed that the stolen

1

property was worth at least five thousand dollars and that the defendant was involved in a conspiracy involving goods that moved in interstate commerce, we reverse the conviction.

REVERSED.

Judge Calabresi concurs in a separate opinion.

_____

SAM A. SCHMIDT, New York, NY, *for Defendant-Appellant.*

MICHAEL H. WARREN, Assistant United States Attorney (Jo Ann M. Navickas, Assistant United States Attorney, *on the brief*), *for* Benton J. Campbell, United States Attorney for the Eastern District of New York, *for Appellee.*

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Defendant Adam Potocki appeals from a judgment of conviction in the United States District Court for the Eastern District of New York (Seybert, *J.*). Potocki was convicted of conspiring to sell stolen property, namely a Stradivarius violin that was later determined to be a fake. *See* 18 U.S.C. §§ 371, 2315. We conclude that at trial the government failed to prove that Potocki believed the violin was worth at least five thousand dollars and that Potocki was involved in a conspiracy involving goods that moved in interstate commerce, as required under 18 U.S.C. § 2315. We therefore reverse the conviction.

## I. BACKGROUND

The facts, taken in the light most favorable to the government, establish that defendant Adam Potocki, a native of Poland who immigrated to the United States as a teenager, at some

2

point became involved with an individual named Krzysztof Sprysak. Sprysak was part of a Brooklyn criminal gang known as the "Greenpoint Crew." (The government has not alleged that Potocki himself was a member of the Greenpoint Crew.) On December 5, 2005, Sprysak telephoned Potocki to tell him that he thought he might have a Stradivarius violin to sell.[1] Sprysak told Potocki that, according to one of Sprysak's associates, the violin had been taken out of Europe, "[i]t was probably even taken out illegally," and it was stolen. Sprysak asked Potocki if he was still in touch with a particular antiques dealer who might be able to appraise the violin, and Potocki agreed to show the dealer a picture of the instrument. The two then conversed about the importance of obtaining genuine items because, as Sprysak put it, "it's, you know, only exceptional items are worth something." Sprysak agreed to provide Potocki with photos and a description of the violin, stating, "you know, it's fucking worth tons of cash. Because a few of these violins . . . he didn't make that many of them." Potocki replied, "[b]ut he'll appraise it for you," and "[h]e'll tell you how much and what's what." Potocki also indicated that the antiques dealer might be able to sell the violin for Sprysak.

---

[1] Stradivarius violins were crafted by Antonio Stradivari, an Italian instrument maker who lived and worked in Cremona in the late seventeenth and early eighteenth centuries. Stradivariuses are prized for their superior tone, which has been attributed to, among other things, "the thickness (and, hence, the vibrational properties) of its wooden top and back plates, the condition of the microscopic pores within the wood of the violin, and lastly the formula of the varnish." *Antonio Stradivari*, *in Encyclopedia Britannica*, *available at* http://www.britannica.com/EBchecked/topic/567870/Antonio-Stradivari#tab=active~checked%2Citems~checked&title=Antonio%20Stradivari%20--%20Britannica%20Online%20Encyclopedia. Genuine Stradivarius violins routinely command very high prices. For example, in 2006, a 1707 Stradivarius sold for $3.5 million, establishing a record for the amount paid for a musical instrument at auction. *See Stradivarius Tops Auction Record*, BBC News, May 17, 2006, *available at* http://news.bbc.co.uk/2/hi/entertainment/4988838.stm.

Potocki called Sprysak back later that evening. He admonished Sprysak to hurry in gathering the photographs and documents, because he was going to see the antiques dealer the next day. He called Sprysak again a few minutes later, reporting that he had talked to the antiques dealer and that the dealer knew someone who could appraise the violin, but that the appraiser needed to see the violin itself. Potocki explained that the appraiser could not rely on photographs "[b]ecause there are many fakes, and listen, this violin may go for up to 1.5 million dollars." According to Potocki, the dealer himself cautioned that "there are many counterfeits." Sprysak told Potocki that his contact had hidden the violin, and that he was reluctant to bring it out until Sprysak had a specific buyer. Near the end of the conversation, Potocki said, "[y]ou never know. So I'll tell you that if it's an original, there a way [sic] in. But as I told you, the guy has to . . . bring it personally. . . . Let him see whether this is it and *that's it*."

The last phone call between Potocki and Sprysak took place two days later, on December 7, 2005. Potocki called Sprysak to inquire about the status of the violin, and why Sprysak had not called Potocki back. Potocki said, "[y]eah, *what's up?* . . . no sound, no sight of you . . . . [Chuckles] What's going on? Fuck, *let's go Christmas is coming.*" Sprysak explained that he did not have the photos or documentation yet, and Potocki said, "[s]o put some pressure on them . . . because *Christmas is . . . on a corner*." They agreed that Sprysak would call Potocki later.

In fact, Sprysak and Potocki never spoke about the violin again. Unbeknownst to Potocki, Sprysak began to explore the possibility of fencing the violin through two other individuals: Abe Berger, another member of the Greenpoint Crew, and a man named Vova, who

was actually a government informant.[2] At trial, Sprysak testified that he contacted Berger about the violin in January 2006, a month after he last spoke with Potocki. Sprysak did not ultimately pursue the transaction with Berger, but instead shifted his focus to selling the violin through Vova, who claimed to have a buyer.

In February 2006, Sprysak and Vova met in a Manhattan hotel with Vova's appraiser, who was actually a New York City detective. Various Sprysak associates were also present, including Krzysztof Czekaj, who had possession of the violin and who indicated he had brought the instrument with him from New Jersey. The "appraiser" examined and photographed the violin. After the violin was recovered by law enforcement authorities in April 2006, it was determined to be a counterfeit Stradivarius worth no more than one thousand dollars.

In March 2006, numerous members of the Greenpoint Crew, including Sprysak and Berger, were charged with a variety of offenses in a twenty-nine-count indictment. Potocki was named as a defendant in only one of those counts – conspiracy to sell stolen property, namely the fake Stradivarius. Potocki opted to proceed to trial, where Sprysak testified on behalf of the government. The jury convicted Potocki on the conspiracy charge. The district court eventually sentenced him to three years' probation and a fine of six thousand dollars.

## II. DISCUSSION

Potocki raises a number of challenges on appeal. The two issues we find dispositive are: (1) whether the government presented sufficient evidence on an essential element of the

---

[2] Nothing in the record indicates that Sprysak had begun to communicate with Berger or Vova about the violin in December 2005, when he was still speaking with Potocki.

conspiracy charge, namely Potocki's belief that the violin was worth at least five thousand dollars, *see* 18 U.S.C. § 2315; and (2) whether Potocki conspired to sell property (the violin) that traveled in interstate commerce, *see id.* For the reasons that follow, we find that the government presented insufficient evidence on both elements.

1. Evidence of Potocki's Belief as to the Worth of the Violin

Potocki's primary contention is that the government failed to adduce evidence sufficient to prove beyond a reasonable doubt that he believed the violin was worth at least five thousand dollars. We have held numerous times that a defendant asserting a claim regarding the sufficiency of the evidence at trial bears a "heavy burden." *See, e.g.*, *United States v. Hardwick*, 523 F.3d 94, 100 (2d Cir. 2008) (internal quotation marks omitted); *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004). However, this burden is not an impossible one. *See United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004). We must ask whether, after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Huezo*, No. 07-0031, 2008 WL 4553150, at *3 (2d. Cir. 2008); *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (citation and internal quotation marks omitted); *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008); *United States v. Tran*, 519 F.3d 98, 105 (2d Cir. 2008) (internal quotation marks omitted). "[W]e defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence," but "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *Lorenzo*, 534 F.3d

6

at 159 (internal citations, alterations and quotation marks omitted); *see also Jones*, 393 F.3d at 111.

18 U.S.C. § 2315 prohibits the sale "of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more . . . after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken." Had Potocki been charged with a substantive violation of Section 2315, the government would have been required to prove that the stolen property was actually worth at least five thousand dollars. But because Potocki was charged only with conspiracy to violate Section 2315, the government had the burden of proving that he believed the violin was worth at least five thousand dollars. *See United States v. Rosa*, 17 F.3d 1531, 1546 (2d Cir. 1994) (in a case where defendants were charged with conspiracy to violate Section 2315, holding that "[b]ecause the charge was not the substantive violation of § 2315 . . . the government was not required to prove that the goods were in fact stolen. The essence of the crime of conspiracy being the agreement, all that was necessary as to *mens rea* was proof of defendants' belief that the goods they conspired to purchase were stolen.").

The government's evidence, which consisted principally of the four phone conversations between Sprysak and Potocki and Sprysak's trial testimony, fell short of permitting a reasonable jury to find beyond a reasonable doubt that Potocki believed the violin was worth at least five thousand dollars. The calls certainly showed Potocki's willingness to help Sprysak fence the violin by connecting him with his antiques dealer acquaintance. And given his quick response to Sprysak, Potocki likely very much hoped that the violin was genuine and that he would reap a

7

handsome payoff for his assistance to Sprysak. However, the phone conversations show at most that Potocki anxiously entertained the possibility that the violin might turn out to be valuable. Potocki noted more than once to Sprysak that there were many counterfeit Stradivariuses, linking that fact to the importance of having the violin inspected and appraised. For example, in response to Sprysak's statement that the violin was "worth tons of cash," Potocki directed him to the dealer, who would "appraise it for you" and tell you "how much and what's what." Potocki also told Sprysak to "[l]et him see whether this is it and *that's it*." Potocki never expressed a belief that the violin was, in fact, both genuine and valuable, at most speculating that the instrument "*may* go for up to 1.5 million dollars" (emphasis added). Neither did Sprysak's trial testimony establish any such belief on Potocki's part. In fact, Sprysak stated that during his conversations with Potocki, he himself believed only that "[t]here was a good chance that it could be an original."

The government points to Potocki's exhortations to Sprysak to hurry up with the violin because "Christmas is coming," and asserts that this statement demonstrates Potocki's belief that the instrument was valuable. We are not of the view that this statement does very much for the government's case. In isolation it merely reiterates Potocki's hope that if the violin were genuine, it would be valuable. In any event, we are obligated to "consider the evidence presented at trial in its totality, not in isolation." *United States v. Zhou*, 428 F.3d 361, 369-70 (2d Cir. 2005); *see also United States v. Bruno*, 383 F.3d 65, 82 (2d Cir. 2004) (quoting *United States v. Dhinsa*, 243 F.3d 635, 648-49 (2d Cir. 2001)). The issue for our purposes is whether Potocki's statements and conduct as a whole constituted proof beyond a reasonable doubt of such a belief,

8

as opposed to a mere hope about the value of the violin. When we consider Potocki's passing remarks about Christmas in the context of the totality of the government's evidence, we still conclude that the wider picture of Potocki's conduct – his efforts to connect Sprysak with his appraiser, his concerns about the existence of counterfeit Stradivariuses, and his unwillingness to reach a conclusion about the actual value of the violin until it was appraised – was inconsistent with an inference that he actually believed the Stradivarius was worth at least five thousand dollars. *See, e.g.*, *Lorenzo*, 534 F.3d at 161 (reversing a conspiracy conviction because a defendant's statement (upon which the government relied), "while indicative of consciousness of guilt, is insufficient in light of the rest of the evidence against him"). In other words, the government's proof that Potocki had serious questions about the provenance and value of the violin meant that it failed to prove beyond a reasonable doubt Potocki's belief that the instrument was worth at least five thousand dollars.

In making this determination, we do not invade the proper province of the jury. We do not improperly question a credibility determination, an assessment of the weight of the evidence, or a choice of the competing inferences that could be drawn from the evidence. Rather, we conclude that, even when viewing the evidence in the light most favorable to the government, this is a case in which the trial evidence simply did not permit a finding beyond a reasonable doubt of an essential element of the crime charged. Section 2315 does not allow a conviction where the evidence shows that, while a defendant hoped or speculated that the value of stolen property exceeded the minimum statutory amount, at the same time, he also entertained concerns that the property was worth less than that amount.

9

## 2. Evidence of the Interstate Element

We also conclude that the government presented insufficient evidence to satisfy another element of Section 2315, that the violin moved in interstate commerce. Under Section 2315, the stolen goods or property must "have crossed a State or United States boundary after being stolen." This requirement is a jurisdictional one; the sale of stolen goods is not a federal crime unless this interstate element has been satisfied. *See Rosa*, 17 F.3d at 1544 ("The interstate or foreign travel [element of Section 2315] . . . is merely the premise for federal jurisdiction."); *United States v. Leslie*, 103 F.3d 1093, 1101 (2d Cir. 1997). The interstate element must be proven beyond a reasonable doubt. *United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir. 1996).

Where a defendant is charged not with a substantive violation of Section 2315 but with conspiracy to violate that statute, "any of a variety of circumstances may suffice to supply the jurisdictional nexus for a federal prosecution." *Rosa*, 17 F.3d at 1545. For example, the government may show that stolen goods actually moved across a state or United States border, or simply "that [a defendant] agreed to receive goods that [he] believed would be stolen and transported to [him] interstate." *Id.* at 1546; *Pinckney*, 85 F.3d at 8. In a conspiracy case, if "at least one coconspirator [believed] that the goods had traveled interstate, we need not explore the evidence of the other defendants' awareness that their crime was federal." *Rosa*, 17 F.3d at 1546. Consequently, the government never has to prove that a defendant actually knew that the goods had previously moved interstate or across a United States border. *Id.* at 1544; *Pinckney*, 85 F.3d at 8.

In an effort to satisfy the interstate element of Section 2315, the government proved that Czekaj brought the violin from New Jersey to New York on his way to the February 2006 meeting between Sprysak and Vova, in furtherance of a conspiracy that included Sprysak, Vova, Czekaj, and others. Potocki does not challenge this evidence. Rather, he contends that the government failed to prove that he was a member of this conspiracy, the only one with an interstate element. While Potocki admits to dealings with Sprysak, he asserts that they occurred outside the Sprysak-Vova conspiracy. Potocki maintains that there is no evidence that he agreed to join a conspiracy that involved the interstate transportation of stolen property, and that the government failed to prove beyond a reasonable doubt that he knowingly or intentionally joined the Sprysak-Vova conspiracy or did anything to further it. Because the interstate component of the Sprysak-Vova conspiracy cannot be exported to the Sprysak-Potocki conspiracy, Potocki contends that the government presented insufficient evidence on an essential element of the charged crime. *See Pinckney*, 85 F.3d at 8 (in a conspiracy case, "[a]lthough the government need not prove commission of the substantive offense . . . it must prove that the intended future conduct [the conspirators] agreed upon include[s] all the elements of the substantive crime.") (internal citations and quotation marks omitted) (second alteration in the original).

It was the government's burden to establish the conspiracy charged in the indictment. *United States v. Alessi*, 638 F.2d 466, 472 (2d Cir. 1980). The government was also obligated to prove that Potocki was a member of this conspiracy, rather than some other conspiracy. To this end, the government had to prove that Potocki "agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Geibel*, 369 F.3d 682, 689

11

(2d Cir. 2004) (quoting *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001)).  In assessing whether the government has met its burden, we look to the government's evidence of the "interrelationship and interdependency" of alleged co-conspirators, as well as "the nature and duration of the enterprise."  *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989) (quoting *Alessi*, 638 F.2d at 473).  While a defendant need not be aware of every detail of a conspiracy, nor of every other member in the conspiracy, *see e.g.*, *McDermott*, 245 F.3d at 137, the government must show "mutual dependence and assistance among the [participants], a common aim or purpose . . . or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture."  *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (citation and internal quotation marks omitted) (alteration in the original).

The government did not prove that Potocki was part of the conspiracy involving Sprysak, Vova, Czekaj, and the other participants in the February 2006 meeting to sell the violin.  It is undisputed that Potocki was unaware that the meeting even occurred, or, for that matter, knew of the background negotiations and preparations surrounding the meeting, its participants, or its purpose (to sell the violin through Vova).  Potocki had agreed, months earlier, to connect Sprysak with an acquaintance of Potocki's who could appraise and possibly sell the violin.  The government provided no evidence, however, that Potocki knew or thought he was part of a broader "collective venture" to help Sprysak attempt to sell the violin to any other potential buyers.  Potocki was neither interrelated with, nor mutually dependent on, Czekaj, Vova, or any

12

of Sprysak's other co-conspirators in the February 2006 scheme. Nor did the government prove that Potocki "was aware of his part in a larger organization where others performed similar roles equally important to" the successful sale of the violin. Although Potocki and, for example, Czekaj might have had similar or even identical purposes – helping Sprysak sell the violin in hopes of compensation for their assistance – these purposes were neither common to, nor shared between, Potocki and Sprysak's later co-conspirators. Unknowingly parallel action is not enough to establish membership in a conspiracy. *Cf. Beech-Nut Nutrition Corp.*, 871 F.2d at 1191.

Perhaps the most telling consideration is the "nature and duration of the enterprise." The players in this case sought to accomplish one isolated transaction – the sale of a violin. Sprysak contacted Potocki (seemingly out of the blue, as the government produced no evidence that they had collaborated before), and asked him to perform one task – to connect him with a particular appraiser. Although Potocki did this almost immediately, Sprysak subsequently abandoned the possibility of working with Potocki and sought out other avenues to achieve a sale. Unlike a classic criminal conspiracy, this case does not involve an overarching illegal enterprise with multiple members and sustained, organized objectives. Potocki undoubtedly had only one aim in mind – to personally profit from connecting Sprysak with his friend the appraiser. The government introduced no evidence that Potocki was committed to helping Sprysak sell the violin in any other way.[3] While the nature and duration of this enterprise is not dispositive to our

___

[3] Nor is there evidence to show that Potocki would have had any reason to help Sprysak in any other way. The government never alleged that Potocki was a member of the Greenpoint Crew or that he was in Sprysak's general employ. Once Sprysak discarded the idea of using Potocki's antiques dealer friend to appraise the violin, there is no evidence that he needed anything else from Potocki, or that Potocki would benefit in any other way from a subsequent sale of the violin.

13

analysis, it tilts towards a conclusion that Potocki's interactions with Sprysak were entirely separate from Sprysak's subsequent conspiracy with Vova, Czekaj, and others.

We have held that "[n]obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it." *McDermott*, 245 F.3d at 137 (citation and internal quotation marks omitted). In *McDermott*, we examined the case of a bank president who passed insider information on to a woman with whom he was having an affair. *Id.* at 135-36. Unbeknownst to McDermott, the woman was simultaneously having an affair with another man, and passing on McDermott's information to him. *Id.* at 136. We declined to find that McDermott was part of a conspiracy with the other man to commit insider trading. *Id.* at 138. We found that "[t]here [was] no record evidence suggesting that McDermott's agreement with [the woman] encompassed a broader scope than the two of them." *Id.* We also found that three possible avenues of liability for McDermott, borrowed from our opinion in *United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986), did not apply: (1) the scope of the arrangement between McDermott and the woman was not broad enough to include insider trading by other persons; (2) the transmission of the information to the other man was not reasonably foreseeable "as a necessary or natural consequence of the unlawful agreement"; and (3) McDermott was not aware of the other relationship. *Id.* at 137-38.

While this case is not congruent with *McDermott* and *Carpenter*, we find those precedents conceptually useful. Here, we see no proof that Potocki was a member of a later conspiracy to sell the violin or that Potocki's agreement with Sprysak "encompassed a broader

14

scope than the two of them." *McDermott*, 245 F.3d at 138. As to the three possible avenues of liability discussed in *McDermott*, the record shows that the scope of the arrangement between Sprysak and Potocki did not encompass Sprysak's later attempt to sell the violin through Vova; that Sprysak's abandonment of the arrangement with Potocki and subsequent pursuit of Vova was not reasonably foreseeable; and that Potocki was unaware of developments that occurred after Sprysak stopped communicating with him about the violin. Because the government presented insufficient evidence that Potocki was part of the Sprysak-Vova conspiracy, its interstate component cannot be imputed to the alleged Sprysak-Potocki conspiracy. Consequently, the government's evidence at trial failed to establish a second essential element of Section 2315.

## CONCLUSION

For these reasons, we reverse the conviction.

15

CALABRESI, *Circuit Judge*, concurring *dubitante*:

If the question in this case is whether Potocki believed that the violin was a Stradivarius, I agree completely with the majority's analysis.

But if the issue instead is the value that Potocki *attributed* to the violin, discounting for the possibility that it was a fake, then we are faced with a different question. Even if Potocki held only a 1 in 100 hope that the violin was a Stradivarius, (which, he told Sprysak, could fetch 1.5 million dollars), the expected value to him would still be $15,000, well above the $5,000 required by the statute. This leads me to think that sufficient evidence might well exist that Potocki believed the violin to be worth at least $5,000. But it seems that the government has not adduced anything in support of this approach, and, hence, I cannot conclude that the Court is wrong to reject it. I do find the question to be a tad puzzling, however—enough to make my concurrence in this part of the Court's opinion *dubitante.*

In any event, I have no questions with respect to the Court's opinion on the interstate commerce issue, and I therefore concur fully in that part of the opinion and in the result reached by the majority.