USA v. Gomez (Ogando)

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued:  February 21, 2008                    Decided:  October 20, 2008)

Docket Nos. 05-0236-cr(L), 05-1113-cr(CON)

_____

UNITED STATES OF AMERICA,

*Appellee*,

– v. –

FRANCISCO OGANDO, also known as Frank,

*Defendant-Appellant*,

MOISES ROSADO, also known as Felix, also known as Jesus, Angel Gomez, Raymond Aquino,
also known as Rey, Frank Echavarria, Ramon Pichardo, also known as Five,

*Defendants*.

_____

Before: KEARSE, CALABRESI, and SACK, *Circuit Judges*.

Defendant-Appellant, a livery cab driver hired to pick up a drug courier at the airport, challenges the sufficiency of the evidence supporting his conviction for conspiracy to import ecstasy, importing ecstasy, conspiracy to distribute and possess with intent to distribute ecstasy, and possession with intent to distribute ecstasy.  Because the evidence was insufficient to demonstrate the specific intent element of each of these offenses, we reverse.

DONNA R. NEWMAN, New York, N.Y., *for Defendant-Appellant.*

BERIT BERGER, Assistant United States Attorney, *for* Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York (Jo Ann M. Navickas, Robert Capers, *of counsel*), Brooklyn, N.Y., *for Appellee.*

GUIDO CALABRESI, *Circuit Judge*:

Defendant-Appellant Francisco Ogando challenges his conviction in the United States District Court for the Eastern District of New York (Block, *J.*) on four counts charging him with conspiring to import ecstasy into the United States, in violation of 21 U.S.C. §§ 952(a), 963, 960(a)(1) and (b)(3), importing ecstasy into the United States, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(3), 18 U.S.C. § 2, conspiring to distribute and possess with intent to distribute ecstasy, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), 846, and possession with intent to distribute ecstasy, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), 18 U.S.C. § 2. Ogando asserts both that there was insufficient evidence for the convictions and that various procedural errors denied him a fair trial. Because we agree that the evidence underlying his convictions was insufficient, we do not reach the alleged procedural errors.

**I. Background**

Ogando challenges his conviction by a jury; we, therefore, view the facts in the light most favorable to the Government. *United States v. Mapp*, 170 F.3d 328, 331 (2d Cir. 1999). Those facts begin with the arrest of Angel Gomez at John F. Kennedy Airport ("JFK") in New York on

August 18, 2002. Gomez, who had just arrived from Brussels, was found carrying 13,587 tablets of MDMA ("ecstasy"). He agreed to cooperate with the authorities.

Gomez had been living in Miami earlier in 2002, when he was approached by his friend Frank Echavarria, who asked if he wanted to be a drug courier. Echavarria introduced Gomez to Ramon Pichardo who, in turn, introduced him to Ray Aquino ("Aquino") and to Aquino's wife Melba. Gomez agreed to travel to Europe and "bring back some stuff," for which he would be paid $8,000. Gomez gave Aquino a phone number at which he could be reached. Gomez, however, needed to update his passport before he could travel. Several days later, a male called the number that Gomez had given Aquino from overseas; this person advised Gomez that someone else would call him about renewing his passport. The next day, Felix Pereida, also known as Moises Rosado ("Rosado"), called, and the two spoke about Gomez's passport renewal. Rosado wired Gomez money to pay the passport application fee. Rosado also advised Gomez that he should fly to Philadelphia so that he could obtain his passport on the same day that he applied for it. Rosado wired him additional money to pay for an airline ticket to Philadelphia.

Rosado and an unidentified male picked Gomez up at the Philadelphia airport and took him to the passport agency. They also told him that he would be flying to France. A few days later, they drove Gomez to the Philadelphia airport. They provided him with a Philadelphia address to use on his customs declaration form upon his return. Rosado told him that, when he arrived in Paris, he should take a train to Amsterdam. Once there, he was to call his overseas contact and advise him that he had arrived.

Gomez followed these instructions, and eventually met his overseas contact, "Ramon," generally referred to as "Rambo"—who was, in fact, Pantaleon Aquino (also known as "Alex Aquino"), Ray Aquino's brother. Rambo told Gomez that Gomez would be importing ecstasy into the United States. Gomez remained in Amsterdam for eight to ten days, during which time he was introduced to Lenny Reynoso, who was also in Amsterdam picking up narcotics to bring back to the United States.

On August 17, 2002, Gomez, Rambo, and an unidentified male traveled to Brussels by train. Gomez waited in an apartment while Rambo went to retrieve the drugs. The drugs were sewn into the lining of a pair of biking shorts. Rambo wanted Gomez to wear the shorts under his clothing, but they constricted his motion, so instead he hid them in the lining of his suitcase. That same night, Rambo gave Gomez final instructions regarding his return flight to the United States. Rambo also called someone named "Frank" in the United States, so Gomez could describe to Frank what he would be wearing the next day, as Frank was supposed to pick Gomez up at the airport. Rambo also gave Frank's phone number to Gomez.

The next morning, Rambo gave Gomez money and instructed him to purchase a ticket to JFK, rather than Philadelphia. Rambo explained that the Philadelphia airport had become "hot." Although Gomez did not know it at the time, on August 11, 2002, Reynoso had been arrested at the Philadelphia airport, where he had arrived on a flight from Paris in possession of approximately 12,500 ecstasy pills which had been sewn into the lining of a pair of biking shorts. Rambo told Gomez that, upon arrival at JFK, he should take a cab to the nearest hotel and call Frank from there. When he arrived at JFK, Gomez was searched and the drugs were discovered. Gomez agreed to cooperate and told agents that he was to give the drugs to someone he was

supposed to meet after arriving at the airport. He told the agents that he was supposed to call Frank upon landing, and subsequently agreed to make a monitored call to Frank. "Frank" is Appellant Francisco Ogando.

Ogando is a licensed livery cab driver. When Gomez made the monitored call and told Ogando that he was about to take a cab to a hotel, Ogando replied, "Oh, but, listen. Uh, uh, uh. I'm outside the airport right now." They then arranged for Ogando to pick Gomez up at the Delta terminal. The agents fitted Gomez with a wire, and Gomez walked around the terminal in an attempt to find Ogando. He also called Ogando several times from pay phones in an attempt to locate him. After three such phone calls, Ogando approached Gomez. One of the agents on the scene said that Ogando "was moving his head side to side and appeared to be looking around for someone." Ogando asked Gomez if he was waiting for someone. When Gomez said that he was, Ogando said, "let's go," they shook hands, and they walked toward the parking lot. At no time did they discuss drugs, money, or where they would be going. As they walked toward Ogando's car, they were both arrested. Ogando cooperated with the agents, telling them where his car was located, giving them permission to search it, and handing over his keys.

On Ogando's person, agents recovered his cell phone, the number of which had been given to Gomez by Rambo in Belgium, a business card which noted, in Spanish, what Gomez was wearing and made a reference to Brussels, a piece of paper with the phone number of Moises Rosado and the name "Moise[s]" written next to it, a card containing a reference to "Alex Aquino" and a phone number, and a card with Rambo's home and cell phone numbers as well as Rambo's wife's phone number, among others. Rambo's wife is Ogando's niece. In Ogando's vehicle, agents found a piece of paper with Lenny Reynoso's name and phone number. A

separate business card contained Reynoso's name, phone number, and the words "Paris Cha de Gol," a seeming reference to Charles de Gaulle Airport.

Ogando agreed to speak with an Immigration and Customs Enforcement ("ICE") agent. He told the agent that he was at the airport because a friend named Alex had asked him to pick someone up. When the agent asked what Alex's last name was, Ogando said that he did not know. He said that he had met Alex on a trip to the Dominican Republic, and that he thought that Alex lived in the Netherlands. He also claimed that he had never picked anyone up for Alex before. When confronted with the pieces of paper with Alex Aquino's full name and phone numbers, Ogando admitted that this was the same Alex. Ogando told the agent that he did not know Lenny Reynoso and that he did not know why Reynoso's name and phone numbers were found in his vehicle.

Ogando was charged with one count of conspiring to import ecstasy into the United States, in violation of 21 U.S.C. §§ 952(a), 963, 960(a)(1) and (b)(3), one count of importing ecstasy into the United States, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(3), 18 U.S.C. § 2, one count of conspiring to distribute and possess with intent to distribute ecstasy, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), 846, and one count of possession with intent to distribute ecstasy, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), 18 U.S.C. § 2.

At trial, Ray Aquino testified that he had known Ogando for several years (although he knew him only as "Frank"—he did not know his last name), and that both he and his brother (Rambo) had been romantically involved with Ogando's nieces. Rambo married Ogando's niece Jeanette. Aquino also testified that, in the summer of 2002, Rambo called him and asked him if Rambo could send him drugs. When Aquino said no, Rambo replied that "[he] shouldn't worry,

because [Rambo] had a friend in Philadelphia and [Rambo] had Frank in New York." Aquino agreed to help his brother find a courier, and subsequently recruited Gomez. Later, after Gomez and Ogando had been arrested, Rambo told Aquino that "Angel and Frank, Jeanette's [uncle], had been arrested at the airport in New York."

The Government also introduced cell phone records showing that, on the day of Reynoso's arrest in Philadelphia, Ogando was in the Philadelphia area. The cell phone records moreover show that, after Reynoso was arrested, Ogando made a number of calls — to a phone used by Rosado, to a phone used by Rambo's wife Jeanette, and to an international calling card number that he used to call Rambo. All of these calls were made in the Philadelphia area, and Ogando then began to travel back to New York.

In its jury charge, the District Court instructed the jury that,

> Although the government must prove that the defendant knew that he was importing a controlled substance, the government does not have to prove that the defendant knew the nature or quantity of the drug which he was charged with importing. It is enough that the government proves that the defendant knew that he was importing some kind of controlled substance.

On the conspiracy charges, the court instructed that the jury must find that Appellant "participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends."

Ogando was convicted on all four counts. The Pre-Sentence Report calculated a Guidelines range of 63 to 78 months' imprisonment. The court granted the defense's motion for a downward departure based on aberrant behavior, U.S.S.G. § 5K2.20, and sentenced Ogando principally to 30 months' imprisonment. Ogando has completed serving his prison sentence.

On appeal, he raises two issues. First, he asserts that there was insufficient evidence to convict him of the offenses charged. And second, he asserts that the district court impermissibly admitted hearsay, allowed the prosecutor to misstate facts in his summation, and mischarged the jury, the cumulative effect of which was to deny him due process and a fair trial. Because we agree that the evidence was, as a matter of law, insufficient to support Ogando's conviction on any of the counts against him, we do not reach the other alleged errors.

**II. Discussion**

A defendant challenging the sufficiency of the evidence underlying a criminal conviction bears a "heavy burden," *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004) (internal quotation marks omitted), because this Court "must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor." *Id*. This Court also "resolve[s] all inferences from the evidence and issues of credibility in favor of the verdict." *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000). In short, reversal is warranted only "if no rational factfinder could have found the crimes charged proved beyond a reasonable doubt." *Gaskin*, 364 F.3d at 459-60. Moreover, "the jury's verdict may be based on circumstantial evidence," *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994), and the Government is not "required to preclude every reasonable hypothesis which is consistent with innocence," *United States v. Chang An-Lo*, 851 F.2d 547, 554 (2d Cir. 1988). However, in order to prove conspiracy or aiding and abetting it is also true that the Government must show "more than evidence of a general cognizance of criminal activity, suspicious circumstances, or mere

association with others engaged in criminal activity." *United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001).

The conspiracy counts (counts one and three) required the Government to present evidence from which it can be reasonably inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it. *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004). In order to establish a conspiracy for these counts, the Government is not required to prove the commission of any overt acts in furtherance of the conspiracy. *See United States v. Shabani*, 513 U.S. 10, 17 (1994). The substantive counts (counts two and four) can be established by demonstrating constructive possession, or by demonstrating that Appellant aided and abetted Gomez's importation and his possession with intent to distribute. Liability for aiding and abetting can be established by showing "that 'the defendant joined the specific venture and shared in it, and that his efforts contributed to its success,'" *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994) (quoting *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990)), or, in other words, by showing that the defendant "'consciously assisted the commission of the specific crime in some active way.'" *Id*. (quoting *United States v. Dickerson*, 508 F.2d 1216, 1218 (2d Cir. 1975)). In short, all four counts required a showing of specific intent, and Appellant asserts that no such showing was made. Rather, Appellant asserts, the evidence shows no more than that he was a livery cab driver doing his job, and that he was hired to drive for individuals engaged in an illegal conspiracy.

In *United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989), we held that there was insufficient evidence to convict a driver of substantive drug importation and possession charges and conspiracy to engage in drug importation where the only evidence that the taxi driver knew

that drugs were being imported was the testimony of an alleged co-conspirator that he was to meet the driver at the airport, combined with the driver's actual presence at the airport. *Id*. at 763. The Court held that, "[s]imply waiting for someone at an airport, even under such suspicious circumstances as exist here, is not, by itself, an act from which knowing guilty involvement can reasonably be inferred." *Id*. at 764. We believe this case is sufficiently similar to *Nusraty* to warrant the same result.

Nothing in Ogando's presence at the airport or in his attempts to locate Gomez was in any way out of the ordinary for a livery cab driver meeting a passenger at the airport. Ogando's personal relationship with some of the conspirators (*e.g.*, a passing familiarity with Ray Aquino and a niece who was married to Rambo) may serve to explain why Rambo hired Ogando as a driver rather than someone else, and why Rambo mentioned to Ray Aquino that Ogando had been arrested. But it does not show that Ogando knew the nature of the conspirators' business. That is, it may be probative of *their* state of mind, but it is not probative of *his*.[1] Additionally, the evidence showing that he was in Philadelphia on the day that Reynoso was arrested and that he made several phone calls to various conspirators when Reynoso failed to show up strongly suggests that he was there to pick Reynoso up—but again that does not show that he knew that

---

[1] The same is true of Rambo's remark, testified to by Ray Aquino, that Rambo "had a friend in Philadelphia and he had Frank in New York." This could be read to mean that Rambo had a driver in New York (Frank) or that Rambo thought that Frank in New York would be willing to receive drugs. On an challenge to the sufficiency of the evidence we must read it to mean the latter. But even so read, it does not tell us anything about Frank's state of mind or his specific intent willingly to receive drugs rather than simply to do his job as a livery cab driver. In this respect, it is well to underscore that none of the evidence in the case suggests that drugs were sent to Frank. The issue before the jury was whether Frank knew that those he was picking up had drugs. As such, Rambo's belief about Frank is two levels removed from what needed to be proved.

Reynoso was carrying drugs. Once more, it simply shows that Ogando was a livery cab driver regularly used by members of this conspiracy. So, too, the fact that he had the business cards and phone numbers of several conspirators on him when he was arrested is wholly consistent with his being a livery cab driver who maintained the contact information of some frequent passengers.

The Government asserts that Ogando lied to federal agents when arrested and that his lying is probative of guilt. He told the ICE agent that he did not know "Alex's" last name, but, when confronted with the piece of paper found on his person with "Alex Aquino" and a phone number written on it, he admitted that this was the same Alex. He also told the agent that he didn't know who Reynoso was, nor did he know how a piece of paper with Reynoso's name and phone number came to be in his vehicle. This Court has held, however, that,

> [w]hile false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt and have independent probative force, this Circuit . . . has held that falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.

*United States v. Johnson*, 513 F.2d 819, 824 (2d Cir. 1975) (internal citations omitted). Indeed, in *Johnson*, we found that "the cumulative weight of the evidence of [the appellant's] presence in [a drug dealer's] automobile at the time the drugs were found, his close association with [the dealer], his false exculpatory statements, and his general lack of credibility," *id*. at 823, were insufficient evidence to sustain a conviction for conspiracy to import drugs.

We believe the same to be true here. Accordingly, the judgment of conviction is REVERSED and REMANDED to the District Court to dismiss the indictment against Ogando.