HALL, Circuit Judge,
dissenting:
The majority holds today that a jury may now infer a defendant’s knowledge of the contents of a bag he never possessed based simply on the fact, demonstrated at trial, that the bag contained “high value” drugs and there exists a record of some number of phone calls of unknown content between the defendant’s cell phone and the cell phones of the principals of the conspiracy. Maj. Op. 66-67. The holding relies on what the majority characterizes as a “common sense” determination that the high value of the drugs in the bag is evidence of a significant trust relationship when considered in conjunction with third-party testimony about the state of mind of the principals of the conspiracy. Maj. Op. 66-67. The majority further reasons that this “trust relationship,” coupled with nothing more than the defendant’s mere presence at the site where government agents foiled, and thus completely prevented, what was to have been a transfer of the bag to the defendant, permits a jury to infer that the defendant knew that there were controlled substances inside the bag. See Maj. Op. 66-67. Relying on cases in which this court has upheld the jury’s inference of a defendant’s “knowledge” based on the facts in evidence, the majority ignores that in each of those prior cases, the well-developed evidence showed that those defendants whose knowledge of the specific object of the conspiracy was inferred (and thus their conspiracy convictions upheld) also played insider roles in those conspiracies. Notwithstanding the absence of such long-recognized corroborating evidence in this case, the majority nonetheless reverses the district court’s decision to acquit the defendant based on insufficient evidence of his knowledge of *77 the object of the conspiracy. Instead, the majority holds that the evidence presented was sufficient to prove the defendant’s knowledge that what he was assisting the other conspirators to do was to transport drugs. Maj. Op. 66-67; see, e.g., United States v. Huezo, 546 F.3d 174, 184 (2d Cir.2008).
This result is an erroneous and dangerous departure from our recent precedents in Torres and Lorenzo, and similar holdings in eases of the same lineage. See, e.g., United States v. Torres, 604 F.3d 58 (2d Cir.2010); United States v. Lorenzo, 534 F.3d 153 (2d Cir.2008); United States v. Ogando, 547 F.3d 102 (2d Cir.2008); United States v. Rodriguez, 392 F.3d 539 (2d Cir.2004); United States v. Jones, 393 F.3d 107 (2d Cir.2004); United States v. Friedman, 300 F.3d 111 (2d Cir.2002); United States v. Samaria, 239 F.3d 228 (2d Cir.2001); United States v. Nusraty, 867 F.2d 759 (2d Cir.1989); United States v. Gaviria, 740 F.2d 174 (2d Cir.1984); United States v. Soto, 716 F.2d 989 (2d Cir.1983). Worse, such a holding radically eases, if not eliminates altogether, the burden on the government to prove beyond a reasonable doubt the defendant’s knowledge and specific intent to commit the crimes that are the charged object of the conspiracy. I offer an illustrative hypothetical of the dangers that are now unleashed.
A Canadian national who immigrated illegally to the United States to avoid pending felony proceedings somehow makes contact with a group of people who are known to him to smuggle people back and forth across the Canadian border. There is no evidence how he came to know the group of smugglers, but we do know that this man is wanted by Canadian authorities and cannot simply drive back over the border to return to his native homeland. Accordingly, he makes numerous contacts with two members of this smuggling group. Given this man’s prior criminal experience, we can infer that he realizes this “safe” route is also a conduit used for smuggling goods — probably even drugs— alongside people. As part of his attempt to make his way back to Canada, one of his smuggler contacts tells him to meet a woman in a shopping mall parking lot in a city in upstate New York. We do not know explicitly whether this is for a bag drop, or simply to receive directions to the smugglers’ border notch where the crossing back into Canada will take place. But we can infer that he has been asked to take a bag, drop it off in New York City, drive back upstate through New York to meet the smugglers, and be smuggled across the border back to Canada by morning.
The man agrees. He then rents a car— an action that is markedly inconsistent with the smuggling group’s known transportation procedures — and rendezvouses with the woman to pick up the bag and begin his circuitous trek back to Canada. They meet at the shopping mall, agree to exchange information in a more private place, and the man follows the woman to a cul-de-sac. The man then tells the woman he has a New York City address for the first stop, but needs GPS coordinates of the smugglers’ location. As the woman begins to enter the address into the man’s GPS device, the police frustrate the exchange. All the while, the man neither possessed nor even inquired about the bag. Although the bag was in the man’s view when he first met the woman at her car at the shopping mall, she did not identify or speak to him about the bag. The police seize the bag, look inside, and discover hundreds of thousands of dollars worth of stolen diamonds. During the arrest, the man makes false statements about his whereabouts prior to meeting the woman. The woman, a longtime associate of the smuggling group, agrees to cooperate with *78 the government. Although the woman had never seen the man before, the woman informs the government the man must have been “trusted” since the principals of the conspiracy are paranoid about losing out on the street value of their contraband. The man now faces conviction under 18 U.S.C. § 2314 and 18 U.S.C. § 371 for conspiracy to transport stolen diamonds.
This hypothetical highlights the important distinction between one who is a trusted member of a conspiracy, such as an insider who may well have knowledge of the conspiracy’s objectives (i.e. the nature of the contraband, such as narcotics or stolen goods), and one who is merely trusted to deliver a package, who may only know that he is to transport a package from point A to point B. Such a distinction is important in the context of proving a defendant’s criminal liability for membership in a conspiracy because “the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent.” United States v. Torres, 604 F.3d 58, 65 (2d Cir.2010). Moreover,
[although “[t]he government need not show that the defendant knew all of the details of the conspiracy, ‘so long as he knew its general nature and extent,’ ” [United States v.] Huezo, 546 F.3d at 180 (quoting United States v. Rosa, 17 F.3d 1531, 1543 (2d Cir.), cert. denied, 513 U.S. 879, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994)), the government “must prove at least the degree of criminal intent necessary for the substantive offense itself,” United States v. Feola, 420 U.S. 671, 686, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). “[T]he knowledge of the parties is relevant” to a conspiracy charge “to the same extent as it may be for conviction of the substantive offense.” Id. at 695, 95 S.Ct. 1255.
Torres, 604 F.3d at 65. A defendant’s suspicious behavior absent proof of his “knowledge that his conduct involve[s] narcotics,” when seeking to convict him of participation in a drug conspiracy, id. at 66, or absent proof of knowledge that his conduct involves “receipt or possession of stolen goods,” when seeking to convict him of conspiracy to receive and possess stolen goods, see Samaria, 239 F.3d at 236, is insufficient to sustain a conviction. Id.; see also Lorenzo, 534 F.3d at 160-62.
Requiring the government to prove a defendant’s knowledge of the general nature and extent of the conspiracy, whether it involves stolen goods or drugs or some other contraband, is intrinsically important, of course, because there is no statute simply criminalizing transportation of “high value contraband.” Indeed, such a statute would likely be void for vagueness. See, e.g., Lanzetta v. New Jersey, 306 U.S. 451, 452, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (striking down state statute criminalizing “gangsters” for failure to provide notice as to what qualified as a “gang”); Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (“[L]aws must provide explicit standards” without “impermissibly delegating] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.”); see also Farid v. Ellen, 593 F.3d 233, 241 (2d Cir.2010) (holding unconstitutionally vague prison regulations that, as applied to prisoner, banned “smuggling” and “contraband”). Yet, despite underlying statutes criminalizing possession that require proof of the defendant’s knowledge of the nature of the contraband, the majority posits that if such contraband is of “high value,” then “common sense” dictates that the defendant simply must have known its nature by virtue of the fact he was acquainted with the conspiracy’s principals. See Maj. *79 Op. at 69-70. Under the majority’s newly articulated rule, therefore, our hypothetical man — despite neither possessing the contraband nor actually knowing its nature-can be convicted of any possession-related conspiracy simply because we can infer he was willing to perform some illicit activity for people with whom he was somehow acquainted.[1]
Of course, the above hypothetical virtually tracks this case’s evidentiary record,save some rhetorical flourish. Both Haki-mi’s and the hypothetical man’s role, unlike the defendant in Huezo, do not bear the usual hallmarks that this Court’s long line of cases addressing the element of knowledge has identified as presenting the requisite evidentiary “indicia of the specific elements of the underlying crime.” Samaria, 239 F.3d at 235 (emphasis added); see also Torres, 604 F.3d at 67.[2]
Nonetheless, the majority frames Haki-mi’s “mere presence at the scene of an aborted drug transfer,” evidence we have held as insufficient in the past, United States v. Nusraty, 867 F.2d 759, 764 (2d Cir.1989), as “impending sole possession.” Indeed, Hakimi’s “mere association with ... some or all of [the alleged co-conspirators who] may have been links in a chain of narcotics distribution,” another legally insufficient indicator, id., is instead evidence of being “well-acquainted” and “well-connected” despite the record being devoid of any content of those calls. See Maj. Op. 69-70. Lastly, the majority relies on the testimony of an admitted coconspirator, who had never before seen Hakimi, that Hakimi “must have been trusted” by the principals of the conspiracy, despite our caution that such testimony “may be probative' of their state of mind, but it is not probative of his.” United States v. Ogando, 547 F.3d 102, 108 (2d Cir.2008). No matter how-the majority wishes to frame these facts, Torres, Lorenzo, and then-precedential forebearers have long precluded the majority’s determination in this case. For these reasons, and the reasons discussed below, I respectfully dissent.
I. Conspiracy
The majority rightly sets forth the Court’s requirements to sustain a conspiracy conviction, and I concur with the majority that there was evidence to support a rational juror’s inference that there existed a conspiracy involving the exchange of contraband. Maj. Op. 60-61, 62-65; see also Torres, 604 F.3d at 68-69 (noting that suspicious conduct, “nervous” appearance, and false exculpatory statements can support an inference that a defendant knew packages contained contraband). I disagree, however, with the majority’s conclusion that there was sufficient evidence for a rational juror to conclude, beyond a reasonable doubt, that Hakimi was a “trusted insider” with the requisite knowledge of and specific intent to ‘transport drugs so as to support his conspiracy conviction for a controlled substance offense.
A. Specific Intent to Commit the Offenses Underlying the Conspiracy
To sustain a conspiracy conviction, the government must present “evidence from *80 which it can be reasonably inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.” United States v. Ogando, 547 F.3d 102, 107 (2d Cir.2008). “The government need not show that the defendant knew all of the details of the conspiracy,” Huezo, 546 F.3d at 180, but it “must prove at least the degree of criminal intent necessary for the substantive offense itself.” United States v. Feola, 420 U.S. 671, 686, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). Here, therefore, the government must have proffered evidence sufficient for a juror to infer rationally that Hakimi conspired to know or intend to “distribute” or “possess with intent to ... distribute ... a controlled substance.” 21 U.S.C. § 841(a)(1) (emphasis added); see also 21 U.S.C. § 846. Such an inference must be “sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt.” Friedman, 300 F.3d at 124 (internal quotation marks omitted); see, e.g., Rodriguez, 392 F.3d at 544; Torres, 604 F.3d at 66.
Absent “proving that the defendant knew he was dealing with a controlled substance,” not simply high-value contraband, the government “cannot establish [a 21 U.S.C.] § 846 conspiracy to distribute or to possess with intent to distribute” a controlled substance. Id. (emphasis added); see also Rodriguez, 392 F.3d at 545 (noting that “the conspiracy and substantive [possession] charges, both of which are specific intent crimes, required the government to established that [the defendant] knowingly and intentionally participated in a drug deal” (emphasis added)). ‘““Proof that the defendant knew that some crime would be committed is not enough.”’” Rodriguez, 392 F.3d at 545 (quoting United States v. Morgan, 385 F.3d 196, 206 (2d Cir.2004) (quoting Friedman, 300 F.3d at 124) (emphasis in Friedman )). Likewise, “[p]roof that the defendant engaged in suspicious behavior” is also legally insufficient. “Evidence tending to show knowing participation in the conspiracy is also needed,” United States v. Soto, 716 F.2d 989, 991 (2d Cir.1983), such as “facts sufficient to draw a ‘logical and convincing connection’ between circumstantial evidence of an agreement, and the inference that an agreement was in fact made.” United States v. Jones, 393 F.3d 107, 111 (2d Cir.2004) (quoting United States v. Gore, 154 F.3d 34, 41 (2d Cir.1998)). Indeed, the lynchpin for sustaining a defendant’s “conviction for conspiracy to traffic in narcotics” remains proof of the defendant’s specific “knowledge that his conduct involved narcotics.” Torres, 604 F.3d at 66; see also Lorenzo, 534 F.3d at 160-62.
Proof of a defendant’s knowledge or intent may be established through “evidence that the defendant participated in conversations directly related to the substance of the conspiracy,” “possession of] or mention[ ] in documents important to the conspiracy,” “proof that a defendant exercised authority within the conspiracy itself,” “receipt of] a share of the profits from the conspiracy,” or the defendant’s statements “explicitly confirming] the nature of the activity in which the co-conspirators were engaged.” Samaria, 239 F.3d at 235-36. Evidence that “merely establishes that [a defendant] associated with conspirators under suspicious circumstances and suspected (or should have suspected) that a crime might occur,” is not specific enough. Friedman, 300 F.3d at 126 (internal quotations, alterations, and citations omitted). Although this list is not exhaustive, it is beyond cavil that we do not lightly permit inferences of a defendant’s knowledge of the object of the conspiracy to be drawn absent some indication that the defendant *81 had some knowledge of the conspiracy coupled with either specific evidence the defendant occupied a “trusted” role in the conspiracy or other circumstantial evidence bearing on the defendant’s knowledge of the nature of the object of the conspiracy. This is meant to distinguish proof of knowing participation in a criminal conspiracy from cases in which the evidence shows only that “the defendant played a role subordinate to that of the principal engaged in the criminal conduct charged, and the defendant plausibly could have fulfilled that role without knowing the scheme’s criminal nature.” See United States v. Davis, 690 F.3d 127, 131 (2d Cir.2012).
B. “Trusted” Conspiracy Members
The majority relies on two primary inferences to show Hakimi’s guilty knowledge: (1) drug traffickers are “very unlikely to confide” high value drugs to the “sole control of a person who was not a trusted member of the conspiracy” and (2) such a “trusted member of the conspiracy may reasonably be expected to have knowledge of the nature of the conspiracy” to distribute illegal drugs.[3] Maj. Op. at 27-28. Now that this Circuit, through the majority, endorses such inferences as rational on this record, virtually any time the government can establish the “high value” of contraband and the defendant’s “impending” sole possession of it, a jury may be instructed simply to infer that the defendant is trusted by the conspirators and may therefore impute knowledge of the nature of that contraband to the defendant. The holding effectively guts our pri- or holdings that knowledge may not be proven when there is no specific evidence as to the nature and operation of the conspiracy and the defendant’s role in it nor evidence of the defendant’s prior conduct which is of the sort that suggests his knowledge of the objects of the conspiracy. See, e.g., Lorenzo, 534 F.3d at 160; Torres, 604 F.3d at 63; Samaria, 239 F.3d at 238. Indeed, in my view, the holding permits a standard that risks the constitutionally impermissible jury determination “that the defendant is probably guilty.” Lorenzo, 534 F.3d at 159 (internal alterations and quotation marks omitted).
Nonetheless, the majority primarily relies on Huezo, Abelis, and Sisea to suggest we have endorsed an inference of a “trust” relationship, and thus proof of specific knowledge of the purpose of the conspiracy, merely by proving that the value of the contraband is high and showing that the defendant was poised to take sole possession of that contraband. This argument is *82 wrong for two reasons. First, the majority opinion is a misapplication of our prior holdings, divorced from the substantial circumstantial evidence those cases relied on in support of an inference that the defendant had a “trusted” status within that conspiracy. Second, permitting such an inference on a record like this one ignores the fact-dependent nature of our case law addressing the element of knowledge and erects an overbroad rule that ignores the factors distinguishing between the activities of known, trusted couriers and mere patsies.
Huezo is particularly ill-suited to provide guidance in this case. In Huezo, a split panel held that “common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds” when considered in conjunction with “the complexity and scale of the money laundering scheme.” 546 F.3d at 182. The scheme in Huezo was a sophisticated international conspiracy involving a “major Colombian money broker” who laundered over $50 million of drug proceeds. Id. at 181. Shortly before the transactions, the defendant traveled from California to Connecticut with the co-conspirators and loaned them his Jeep for an initial drop-off planning meeting with an undercover agent posing as a conspirator. Id. at 182. Three days later, he accompanied his co-conspirators and “drove a suitcase containing $500,000 to a meeting with [the undercover agent] and unlocked the trunk from the driver’s seat to allow [the agent] to remove the suitcase.” Id. Two days later, he “ ‘basically help[ed] to guard’ the movement of a second suitcase containing $500,000” into his own car, then drove his co-conspirators to a second, planned drop-off meeting. Id. All the while, “he shared a residence and socialized with” his co-conspirators at “the same house where all of the money was kept.” Id. “Moreover, there was evidence that [he] personally took possession of the small bag containing $6000,” his payment, “that he placed it behind his own seat in the Jeep, and that the money was packaged similarly to the $500,000 in the larger suitcases.” Id.
On that record demonstrating (1) the defendant’s extensive contact with the money and the principals of the conspiracy, (2) the complexity of the scheme, (3) and the defendant’s receipt of a share of the profits from the conspiracy, the jurors were permitted “to rely on their common sense and experience in drawing inferences” of the defendant’s knowledge and specific intent sufficient to sustain a conspiracy conviction. Id. Huezo requires much more than “common sense” and high-value contraband to support an inference that a defendant is a “trusted” conspiracy insider.
For that reason this Court has already suggested an “analogy to Huezo is inapt” to a case similar to this one when packages containing a million-dollar cocaine shipment were addressed to the defendant. Torres, 604 F.3d at 70. Despite the proof of the defendant’s dogged attempts to pick up the packages, we held this to be insufficient because “the government presented no evidence as to the nature of [the defendant’s] associations with the” the conspiracy principals who sent the packages. Torres, 604 F.3d at 71 (emphasis added). In Torres, too, “[t]here was no evidence of a sizeable payment to [the defendant] that might reflect an expectation related to the million-dollar street value of the [illegal drugs],” “no evidence by [the defendant] other than his efforts to gain possession of [the drugs],” and no “evidence that [he] was placed in a position of trust” despite his name being on the parcels containing *83 the drugs.[4] Id. The record here is equally devoid of such evidence. Although we know Hakimi had contact, perhaps even “extensive” contact as the majority suggests, we know nothing of the “nature” of those contacts. Furthermore, there is no evidence of payment, no evidence of his role other than his meeting with Anderson, and no evidence of his trusted status in the conspiracy other than third-party testimony similar to that we rejected in Ogando, 547 F.3d at 107. Accordingly, Huezo “common sense” inference should be confined to situations with similar substantial records showing a defendant was participating in a sophisticated conspiracy unlike the pedestrian drug-running operation we have here.
Indeed, the other precedent on which the majority relies is equally inapposite as support for its more lenient test for inferring a defendant’s knowledge of the purpose of a conspiracy. To support the idea that “impending sole possession” coupled with high-value contraband — absent a showing of the nature of the defendant’s relationship with the principals of the conspiracy or the defendant’s role in the conspiracy — supports a “trusted conspirator” inference, the majority relies on United States v. Abelis, 146 F.3d 73 (2d Cir.1998). In Abelis, we rejected a challenge to the sufficiency of the evidence to support a conviction for conspiracy to commit extortion. In so doing, we noted that “the jury was entitled to place great weight on the fact that the other conspirators trusted [the defendant] to safeguard [a] $3.5 million payment that was to be made into an offshore bank account to which [the defendant] was the sole signatory.” Id. at 81. While straight monetary payment certainly presents a different scenario from the one we address here, we mentioned the evidence of this multi-million dollar payment as a basis for inferring “trust” only after extensively reviewing other circumstantial evidence present in the record: (1) the “evidence showed that [the defendant] was a close friend of both [co-conspirator principals]”; (2) one principal stayed in the defendant’s home and used his home telephone to call the other principal; (3) the defendant “was present at and participated in key meetings involving the payment” of the extorted money; (4) the defendant attended a key meeting to put extra fear in and pressure on the victim to cause him to pay; (5) statements indicated the defendant had a past understanding of the victim’s previous promises to pay money in exchange for protection; (6) he attempted to get the victim to pay; (7) he and two of his associates drove the two principals of the conspiracy for two-hours “late at night in a rainstorm” to meet up with the two victims who had been taken there by other *84 associates; (8) he typed on a computer the “agreement” to pay the extorted money; and lastly, (9) he provided his offshore bank account to serve as the repository for the extorted funds. Id. Only in light of this additional extensive evidence in the record did we hold that the defendant’s “active participation in the evening’s events — typing the contract and providing his bank account as the destination of the funds — as well as his presence at the signing of the agreement, could reasonably be interpreted as acts in furtherance of the conspiracy.” Id. The facts relied on in Abelis, therefore, are so much more robust than those in the thin record before us that Abelis has little application where, as here, there is no evidence demonstrating the nature of the defendant’s role or association with alleged co-conspirators.
Other cases on which the majority relies have equally extensive records demonstrating the nature of the relationship between the defendant and the principals of the conspiracy and the defendant’s role in the conspiracy. See United States v. Sisca, 503 F.2d 1337, 1343 (2d Cir.1974) (noting evidence showed the defendant met with principles of the conspiracy, owned “and shared with his wife exclusive possession of a house found strewn with narcotics and various other paraphernalia of a heroin trafficking operation,” was “presen[t] on the premises while others entered and left carrying containers of heroin,” and was entrusted with $60,000 in cash, permitting the inference that he “performed the critical role of maintaining the ‘stash’ or ‘safe haven’ for the distribution operation”); United States v. Ramirez, 320 Fed.Appx. 7, 10 (2d Cir.2009) (summary order) (noting evidence showing, inter alia, that defendant exchanged a prearranged codeword with an undercover officer, the defendant “had almost half a million dollars in cash in a suitcase in the cab’s trunk,” removed the cash-filled suitcase from the trunk and gave it to the undercover officer, confirmed that “[i]t’s all there” in response to the officer’s question, “Everything’s in there, right, five?,” as well as proof that he drove his livery cab to the building from which a call arranging the money-drop meeting had been placed and, after a conversation, permitted a man to place a box containing five kilograms of cocaine in the trunk of his cab before circuitously and evasively driving to a location in Queens where he flashed his headlights at an approaching car and conversed with its driver before opening the trunk of his cab to allow the driver to remove the cocaine-filled box); United States v. Aleskerova, 300 F.3d 286, 293-94 (2d Cir.2002) (noting the defendant had “extraordinary travel plans” from Azerbaijan to New York coinciding with a crucial meeting where she was to facilitate the sale of stolen art, actually had handled the stolen art, knew the combination of the locked suitcase in which the art was secreted, provided “bank account information written in [her own] handwriting [ ... so as] to share in the proceeds of the sale,” and, only “in the absence of evidence of any relationship ... outside of the conspiracy” between the defendant and her co-conspirator was an inference permitted to be drawn that phone calls of unknown content were “in furtherance of the conspiracy” (alterations omitted)). Each case permitting the inference of a “trusted” relationship relies on an evidentiary record demonstrating much more than a showing, as here, of only “imminent” (rather than actual) sole control of highly valuable contraband and phone calls of unknown content. Indeed, in each of those cases, the defendant already had sole control of the contraband, had extensively participated in the conspiracy, or had demonstrated insider knowledge about the objects of the conspiracy. Only then did we approve as rational an *85 inference that the defendant was a “trusted insider” or had knowledge of the nature of the contraband. The majority here erroneously crafts a broad, overarching legal principle out of mere morsels of these fact-intense sufficiency reviews, and worse, the logical inferences the majority endorses on this record are ones that significantly diminish the evidentiary burden the government must shoulder to sustain a conspiracy conviction.[5]
In fact, the majority’s holding endorses generalizing in a way that belies our case-by-case factual inquiry into whether there is sufficient proof of a defendant’s knowledge in conspiracy cases and outright ignores that principal participants in a drug conspiracy often do confide a high-value quantity of drugs to one who is not a trusted member of the conspiracy. The evidence presented at trial does not carry the indicia of specific knowledge sufficient to permit a jury to infer that Hakimi knew that the contraband at issue was a controlled substance. Indeed, this case’s facts provide a bright contrast to all cases on which the majority relies.
Cheyenne Anderson testified that Perla (Daisy Realza) was the ringleader of sorts. Typically Perla, never Dallas George, would contact Anderson about doing a “run.” She or Joe Mason, the usual couriers, would pick up the drugs from a boat docked at the reservation. The boat was normally operated by her cousin, Dustin George, the brother of Dallas George. She and Mason were typically escorted by look-out or blocker vehicles. Anderson would arrange for her own escorts. Anderson also took a passenger to help her drive. She did not use rental cars because rental cars were red flags for police officers. Anderson, once she reached New York, would pick up cocaine to bring back to Perla. ' Dallas George, Anderson testified, was not reliable to receive a transfer of drugs because he was oh drugs. Anderson also testified that it was her family connection to the organization, which at one point had been run by her family, that made her a trusted member.
Hakimi, not previously known to Anderson as a person involved in the organization, was not asked to pick up the drugs from the boat or even from Anderson’s apartment, as trusted members of the conspiracy are asked to do. Rather, Hakimi was instructed to go to the Massena Wal-Mart. Hakimi arrived in a rental car, which a regular member of the organization would not have done. He was unfamiliar with the reservation area. Ad *86 ditionally, accepting that Dallas George was the contact point in common between Anderson and Hakimi, which was out of the ordinary given Anderson’s testimony that she dealt only with Perla, Dallas George’s text messages to Anderson checking on the status of the situation that day are also suggestive that Hakimi was not an insider. To that end, I am not persuaded that Hakimi’s post-arrest statements to Anderson suggesting that he knew Perla, phone calls of an unknown nature between Perla and him, and his few contacts with the phone number attributed to Dallas George are sufficient, without more, to support an inference that he is a trusted member of the conspiracy. Indeed, the call logs for April 15 and 16, 2011 reveal that the phone in Hakimi’s possession placed a call to the Dallas George number around 1:51 p.m. on April 15. That phone placed a second call on April 16 at 11:49 am. The government, during the Rule 29 hearing, stated that those calls totaled little more than 6 minutes in length. Moreover, all of Hakimi’s calls with Perla and Dallas George took place hours or days before Perla or Dallas George had asked Anderson to do the run and learned that Anderson could not do the run.
At most, from this record, the jury could infer that Anderson was not going to be able to do the run as planned, thus causing Perla and Dallas George to make emergency arrangements which involved an outsider, Hakimi, picking up the package from Anderson at a different location than the conspiracy normally used according to Anderson. The reason Hakimi was chosen or the nature of his prior relationship with Dallas George or Perla is unknown. Haki-mi had minimal contact with Dallas George in the period leading up to the transfer. Hakimi was insulated from the sensitive aspects of the operation that known, trusted couriers were involved with — such as picking up the package at the boat, or even direct contact with the leader, Perla. I cannot agree, therefore, that the sparse record in this case supports any inference by a jury that Hakimi was a “trusted conspirator” such that they could then infer that Hakimi had specific knowledge that what he was going to be transporting was drugs.
Given the distinguishing factors between the activities of the known, trusted couriers in the conspiracy underlying this case — Cheyenne Anderson and Joe Mason — and the manner in which Hakimi was operating, such a “common sense” assumption by the jury can amount to nothing more than speculation. See Torres, 604 F.3d at 67 (“[T]he jury’s inference must be reasonably based on evidence presented at trial, not on speculation!.]” (internal quotation marks omitted)). Admittedly, as highlighted by the majority, we have suggested that committing highly valuable contraband to the defendant’s sole possession, involvement of the defendant in sensitive stages of the conspiracy, and the defendant’s relationship and level of contact with his coconspirators can establish an inference that the defendant does have the requisite knowledge to be guilty of conspiracy. In my view, however, the record before the jury — and before us on review — lacks any of the traditional hallmarks of a trust relationship between Hakimi and the principals so as to support a conclusion that Hakimi was a “trusted conspirator” with knowledge of the drug conspiracy.
Moreover, as suggested above, our precedent holds that knowledge can be inferred from a number of factors. We have affirmed convictions, however, only when such inferences are not speculative and are supported by some showing of specific evidence as to the nature and operation of the conspiracy and the defendant’s role in it or *87 the defendant’s prior conduct suggesting knowledge of the objects of the conspiracy. See, e.g., Aleskerova, 300 F.3d at 293-94. Indeed, even the specific facts underlying the holdings in each of the cases cited by the majority make clear that additional corroborating factors were important, if not crucial, components of the jury’s findings and of our subsequent reviews. Our deference to a jury’s verdict cannot be the basis for deferring to logically deficient inferences unsupported by a showing of anything more than phone calls of unknown content and a defendant’s proximity to high-value contraband over which the conspirators intended him to have sole control. I therefore cannot join a decision which, in my view, departs too far from the limits of Torres and Lorenzo and permits a jury to infer knowledge only from defendant’s possession of a high-value item, from which, the majority says, the jury could also infer a trust relationship. Such a result all but eliminates the government’s burden to prove knowledge beyond a reasonable doubt in possession conspiracy cases.
C. Our Case Law on The Issue of Knowledge
As discussed, there is little support in our holdings in Huezo, Abelis, or Sisea, or even in the jurisprudence of our sister circuits, warranting a rule that imminent future (but not present) sole control, when considered with regard to high-value contraband and unknown associations with the principals of a conspiracy, supports the inference that the person about to receive the contraband is a “trusted conspirator.” Although the majority contends that such a “common sense” position is one we have already “repeatedly endorsed,” Maj. Op. 66, such inferences are precisely of the sort that we have consistently refused to draw on records similar to the one here. See Jones, 393 F.3d at 111.
The majority attempts to bolster the inference that the defendant was a trusted coconspirator by likening this case to its distant Huezo relatives and suggesting that, when considering the “totality” of the other corroborating evidence, we can easily find that Hakimi was a knowing insider. Maj. Op. 69-70. This “totality,” however, consists of phone calls of unknown content to one principal, phone calls of unknown content to another principal, including one on the morning of the planned drug transfer, and third-party testimony that these conspirators would not have trusted their high-value contraband with just any courier. All other evidence considered amounts at most to suspicious behavior of the defendant leading up to his arrest and his presence at the foiled drug exchange. We have time and time again unreservedly reversed conspiracy convictions considering similar evidence, notwithstanding the deference owed the jury’s verdict, on the basis that the evidence, much stronger than that in the instant matter, was insufficient to support an inference of the defendant’s knowledge.
Having discussed Torres above, United States v. Lorenzo, 534 F.3d 153 (2d Cir.2008), serves as an apt starting point. In Lorenzo, we reversed the jury verdict because, even though a transfer of purported drug proceeds occurred and the evidence showed the defendant played a key role in that transfer, the defendant’s participation was “consistent with participation in a wide variety of offenses.” Id. at 160. The government had also shown that Lorenzo’s nephew was involved in drug trafficking, that Lorenzo had contact with his nephew, that Lorenzo was present to pick up the drug courier and take her to a hotel, and that, a day later, Lorenzo gave the courier a suitcase containing $14,000 to deliver to his nephew. Additionally, Lorenzo gave a false exculpatory statement about giving *88 the money to the courier, and the courier was told to call Lorenzo during a subsequent trip. Id. at 161. The government argued that this “call,” viewed with the other evidence, supported an inference that the principal of the conspiracy “would not have entrusted [Lorenzo] with the suitcases concealing the narcotics, worth over $250,000, unless [Lorenzo] had known what was concealed within them and that it was reasonably foreseeable to him that the smuggled narcotic ... was cocaine.” Id. (internal quotation marks omitted). We rejected this argument and reversed the conviction, noting that such an “unfulfilled request ... cannot support such a speculative and attenuated inference” even when considered in light of the other evidence. Id.
We reached a similar result in United States v. Ogando, 547 F.3d 102 (2d Cir.2008). There, we reversed a jury conviction for, inter alia, conspiracy to import ecstasy and conspiracy to distribute and possess with intent to distribute ecstasy. In that case, Ogando, a taxi driver, displayed suspicious behavior in meeting up with a drug courier at the airport whom he was hired to pick up. Id. at 108. Upon escorting the courier to his car, Ogando was arrested. Id. The government established at trial that Ogando was present at another airport where another coconspirator was arrested earlier, that he made false exculpatory statements during his arrest, and that he had business cards and contact information for members of the conspiracy on him and multiple numbers of principals of the conspiracy in his cell phone. All of this, however, we held as evidence that “simply show[ed] that [defendant] was a livery cab driver regularly used by members of this conspiracy.” Id. at 108. This is because our jurisprudence holds that a defendant’s suspicious behavior in attempting to take delivery of narcotics shipment does not indicate knowledge that the shipment contained drugs. See, e.g., Torres, 604 F.3d at 70-71. Indeed, the government also presented testimony that Ogando was hired as the driver because he was a “friend” from “New York.” We refused to find a basis for inferring a trusted relationship based on that testimony because “it [did] not show that Ogando knew the nature of the conspirators’ business,” rather it showed the conspirators’ intent but not his own. Id. We reversed Ogando’s conviction for insufficient evidence.
Again, we followed a similar course in United States v. Friedman, 300 F.3d 111 (2d Cir.2002). There we reversed the jury verdict because the evidence at trial failed to demonstrate that the defendant had specific knowledge about a co-conspirator’s extortion plot. Id. at 126. The evidence included three phone calls between the defendant and a co-conspirator, one 43 minutes in length in the days leading up to the crime, a record of calls between an associate of the defendant and other members of the conspiracy, and testimony that the defendant had a friendly relationship with the co-conspirators. Id. at 125. The government also showed that the codefen-dant arranged for the defendant to wire money to another co-conspirator in order to purchase firearms and a car, and that, on one occasion, the defendant asked the co-defendant to meet the remaining conspiracy members with firearms and a car. Id. at 125-26. Nonetheless, we held that the defendant “met the heavy burden [of demonstrating ... ] that the evidence was insufficient.” Id. at 126 (internal quotation marks omitted).
Yet again, in United States v. Gaviria, 740 F.2d 174 (2d Cir.1984), we reversed a conviction on the basis that evidence did not demonstrate the knowing participation in a drug conspiracy and only showed that the defendant had a connection with *89 drug traffickers. The evidence showed that the defendant and a friend went to an apartment identified by law enforcement as a “stash pad.” The pair entered the building together and left in a suspicious manner and, when stopped by law enforcement, the defendant lied about her presence at the building. Id. at 183. A search of the apartment indicated that cocaine had been prepared in the apartment. Id. Law enforcement found seven grams of cocaine in a package on the floor of the defendant’s vehicle and confronted the defendant with the plastic bag containing white powder to which she responded “the cocaine wasn’t found on my side of the car, was it?” Id. Further, the government showed that Lopez knew the drug traffickers and knew that they engaged in the sale of narcotics. In reversing the defendant’s conviction, we noted that “contact with drug traffickers” alone is “insufficient to prove participation in a conspiracy.” Even when coupled with the exculpatory statements, the record did not substantiate the defendant’s knowing participation in the conspiracy charged. Id. at 184. Again, we reversed for insufficiency of evidence.
Several other cases, some previously noted, hold similarly on records more substantial than the instant one. See, e.g., Torres, 604 F.3d at 70-71 (holding that a defendant’s suspicious behavior in attempting to take delivery of narcotics shipment did not indicate knowledge that the shipment contained drugs); United States v. Rodriguez, 392 F.3d 539, 546-48 (2d Cir.2004) (holding that evidence demonstrating only that defendant served as a lookout for some sort of illicit transaction is insufficient that he knew it was a drug transaction specifically); United States v. Samaria, 239 F.3d 228, 236-38 (2d Cir.2001) (holding that a gypsy cab driver’s presence in a car with conspirators, and assistance with loading non-transparent boxes con taining stolen credit card information, did not demonstrate knowledge of conspiracy to commit credit card fraud). As the court below found and as the record discloses, there is absolutely no circumstantial evidence beyond the street value of the drugs and phone calls of unknown content. And the majority points to nothing further. All the jury had before it was evidence that Hakimi had multiple phone contacts with several principals of the organization and that he showed up to pick up a package that he would transport on behalf of the principals. There exists no evidence to bolster an inference that Hakimi knew that he was to be given drugs to transport. A jury ought not to be able to find from those facts alone that the defendant had specific knowledge of the contents of the package, and the jury here had no basis in the law to infer from this record that Hakimi knew specifically that the object he was to transfer was a controlled substance without our fashioning, as the majority does today, a new rule that significantly modifies our well-settled conspiracy jurisprudence. I would affirm the district court’s determination under Fed R.Crim. P. 29 that the evidence presented was insufficient as a matter of law.
II. Attempt
The majority’s reasoning with respect to the attempt conviction fails for largely the same reasons as the conspiracy conviction. In order to prevail, the government had to prove beyond a reasonable doubt that Hakimi “had the intent to commit the object crime” and “engaged in conduct amounting to a substantial step towards its commission.” United States v. Farhane, 634 F.3d 127, 145 (2d Cir.2011). Of course, attempt, like conspiracy, is a specific intent crime. When possession is the underlying offense, knowledge of the nature of the contra *90 band possessed is similarly crucial. For the same reasons discussed above, the evidence presented simply does not show that Hakimi had knowledge that the contraband was drugs. Although Hakimi sat in Anderson’s truck in proximity to the blue bag containing the pills, there is no evidence that Hakimi touched the bag or knew what was in it. Likewise, there is no evidence that the bag was transparent, or that the bag was open, although there is some suggestion in the record that the bag was slightly open and that the agents could see some plastic. Anderson never testified that Hakimi even noticed the bag. The district court, too, noted the absence of evidence that Hakimi inquired about the bag’s contents drugs and also that Hakimi never made any statements about drugs. Finally, the court observed that “the only conversation [Anderson] and the defendant had during their interaction on the dead-end road pertained to directions back to the Reservation.” On this record, there is no evidence that Hakimi knew drugs were involved or that he was in the vicinity of drugs. The record provides no evidence that Hakimi knew what he was about to possess, and that shortcoming is fatal to his attempt conviction. Accordingly, I would affirm the district court’s determination that the evidence was insufficient as a matter of law to sustain such a conviction.
Conclusion
There is no basis in this record on which the jury could rationally infer a trust relationship between Hakimi and the principals and thereby infer Hakimi’s knowledge of the nature of the contraband. To that end, the majority proposes a broad holding that a jury can infer a “trusted insider” status, and thereby knowledge of the nature of the object of a conspiracy, from nothing more than the value of the contraband to be transported, phone calls of unknown content, and a co-conspirator’s intention that the defendant have sole possession of the object to be delivered. This is not, in my view, in line with this Circuit’s prior precedent and is tantamount to the sort of speculation that we have previously held insufficient to support a conviction for drug conspiracy or attempted possession of controlled substances. I respectfully dissent.[6]

. Even though there is no evidence that the defendant ever saw or was ever told what was in the bag, the government may now prove that the defendant knew the conspiracy involved controlled substances, trafficked in violation of title 21 of the United States Code, or stolen diamonds, trafficked in violation of title 18 of the United States Code, merely by looking into the bag after it has been seized and deciding, based on the contents of the bag, which label to assign and which conspiracy to charge.

. The majority, too, recognizes that Huezo presented "more extensive” evidence regarding the nature of the relationship between that defendant and his co-conspirators. Maj. Op. 70.

. The majority also relies obliquely on the fact that the duffel bag was unsecured (i.e., not sealed) as "strong evidence of Hakimi’s trusted status,” which in turn supports its conclusion that Hakimi knew the bag contained narcotics. See Maj. Op. at 70 & n. 12. The argument that Hakimi could "do with [the drugs] as he wished” because the drugs were in a duffel bag rather than in a taped box or sewn into a garment, is, with all due respect, a red herring that proves nothing about Haki-mi’s possible knowledge of the bag’s contents at the time he was arrested, see id.., and demonstrates to a significant degree the circularity in the majority’s reasoning. If he knew the nature of the contraband, he could just as easily flee with the goods whether they were in a sealed box, sewn into a dress, or simply zippered up in a duffel bag. If he did not know what the package contained, finding out would take nothing more than a knife or pair of scissors regardless of how the goods were packaged. To the extent the majority implies that couriers can somehow get away with pilfering a few bags of narcotics more easily when they are in an unsealed duffel bag — and thus couriers who are given duffel bags are trusted insiders — that argument is also a flawed. See id. To suggest that recipients would not inspect the package upon delivery, or that senders would not look first to their courier upon receiving a complaint that the package was light defies common sense.

. The majority attempts to dispel Torres as inapposite simply because the defendant there had "no prospects of having sole dominion over” the illegal drugs. While it is true that the defendant was accompanied by other men during his attempted pick-ups, we paid equal weight to the fact that the packages "although addressed to him in name, could not be received by him in a location that he controlled; they were not addressed to his home (if he had a home) but rather were addressed to him at a place with which he was not shown to have any connection.” Id. at 71. Furthermore, the majority’s "impending sole control” does little to refute “an inference that [a defendant] became involved in the conspiracy by happenstance and not by design,” see, e.g., Samaria, 239 F.3d at 231 (reversing a conspiracy conviction despite evidence that the defendant permitted conspirators to load a box containing stolen goods into his car, appeared to serve as a "lookout,” and drove the conspirators to another location where they picked up and loaded additional boxes into a yellow cab), or even that the defendant's "impending sole possession” was “consistent with participation in a wide variety of offenses,” Lorenzo, 534 F.3d at 161, such as transporting stolen diamonds, for that matter.

. The majority also asserts that our sister circuits have adopted similar inferences on records similar to the one here. On close examination, however, in each case there was more extensive evidence presented at trial to warrant such an inference than was presented in this case. See, e.g., United States v. Gbemisola, 225 F.3d 753, 759-60 (D.C.Cir.2000) (noting that travel to a distant city, the suspicious manner in which packages were retrieved, use of false names on mailboxes, and defendant's actual removal of contents from the package coupled with the use of the false bottom pots which presented a hazard to an innocent recipient supported an inference of knowledge); United States v. Quilca-Carpio, 118 F.3d 719, 721-22 (11th Cir.1997) (holding that, in an airport-smuggling case, a jury may infer knowledge from the high-value nature of cargo in defendant’s care, but noting that in this specific case it was reasonable to infer knowledge about the contents of his own luggage given that it was unlikely for a prudent smuggler’ to entrust high value cargo to an innocent person (especially in that innocent person's own luggage) and it was unlikely defendant was unaware of the contents of his bag given its unusual weight); United States v. Uriostegui-Estrada, 86 F.3d 87 (7th Cir.1996) (observing also that the jury could infer knowledge from defendant's possession and control of one million dollars in heroine and suspicious travel history).

. Noting that four judges (albeit two are the controlling majority on the Court of Appeals) are evenly split on whether there was sufficient evidence to convict Hakimi, I do join in Footnote 20 of the majority opinion.